668 So.2d 1368 (1996)
Terry L. WHIDDON and Charlene B. Whiddon
v.
Virgie HUTCHINSON, et al.
No. 94 CA 2000.
Court of Appeal of Louisiana, First Circuit.
February 23, 1996.
*1371 Phil E. Miley, Baton Rouge, for Terry L. Whiddon and Charlene B. Whiddon.
John W. Perry, Jr., Baton Rouge, for Virgie Hutchinson and Gordon Hutchinson.
Donald R. Smith, Baton Rouge, for Allstate Ins. Co.
William F. Janney, Baton Rouge, for State Farm Mut. Auto. Ins. and Gordon Booty.
Before LeBLANC, PITCHER and FITZSIMMONS, JJ.
LeBLANC, Judge.
This appeal involves a personal injury suit arising from a three-vehicle collision. For *1372 the reasons stated below, we affirm in part, reverse in part, and amend in part.

FACTS
At approximately 2:35 p.m., on May 7, 1990, defendant, Virgie Hutchinson, was driving an El Camino southbound on Sullivan Road in Baton Rouge, Louisiana; two of her grandchildren were passengers in the vehicle. Sullivan Road is a two-lane road with a speed limit of 45 m.p.h. Plaintiff, Charlene Whiddon, was driving directly behind Mrs. Hutchinson in a Dodge Caravan.
As Mrs. Hutchinson approached a Cracker Barrel convenience store located on the left side of the road, she put on her left-turn signal and came to a stop. Mrs. Whiddon stopped behind her. At the same time, defendant, Gordon Booty, was driving a tractor-trailer gravel truck in a northerly direction on Sullivan Road, approaching the location of the Cracker Barrel, at a speed of 40 to 45 m.p.h. As he came around a curve, he observed Mrs. Hutchinson's vehicle slowing to a stop with its left turn signal activated. Mr. Booty took his foot off the accelerator, but did not apply his brakes.
Almost immediately after coming to a stop, Mrs. Hutchinson began her left turn, crossing the northbound lane directly in the path of the Booty truck. Mr. Booty immediately applied his brakes and attempted to steer his truck between the rear of the Hutchinson vehicle in the northbound lane and the Whiddon vehicle in the southbound lane, hoping to strike only a glancing blow to each. However, the truck's brakes locked and the trailer skidded and started to jack-knife. Mr. Booty's attempt to squeeze between the vehicles was unsuccessful. His truck struck the rear of the Hutchinson vehicle, then entered the southbound lane and hit the front of the Whiddon van, knocking it backward. The collision caused Mrs. Whiddon to suffer a severe closed-head injury, which resulted in permanent residual problems. Neither Mr. Booty nor anyone in the Hutchinson vehicle was injured.

TRIAL COURT PROCEEDINGS
On April 10, 1991, Charlene Whiddon and her husband, Terry L. Whiddon, filed suit for damages against Virgie and Gordon Hutchinson, their automobile liability insurer, Allstate Insurance Company (Allstate), Gordon Booty, and his insurer, State Farm Mutual Automobile Insurance Company (State Farm). Thereafter, on July 31, 1991, Allstate filed a motion to deposit its $100,000.00 policy limits, plus accrued interest of $3,518.82, into the court registry. In conjunction with the deposit, Allstate obtained an order stating that the funds were "to be held and withdrawn in accordance with law and after a determination of the validity of the claims of the plaintiffs and any other potential claimant."
A jury trial was held July 19-21, 1993. The jury returned a special verdict in favor of plaintiffs, finding Virgie Hutchinson ninety (90) percent at fault and Gordon Booty ten (10) percent at fault in causing plaintiffs' injuries. The jury made an in globo damages award of $821,000.00 to Charlene Whiddon and $225,000.00 to Terry Whiddon for loss of consortium.
On January 14, 1994, the trial court signed a judgment in accordance with the jury's verdict as to the assessment of fault and damages. The judgment held Virgie Hutchinson, Gordon Hutchinson, and Allstate liable, in solido, for ninety (90) percent of said damages, with the liability of Allstate on the principal amount being limited to its $100,000.00 policy limits. The judgment further held Gordon Booty and State Farm liable, in solido with Virgie Hutchinson, Gordon Hutchinson, and State Farm, to the extent of fifty (50) percent of the principal amount of the judgment, with the liability of State Farm on the principal amount being limited to its $500,000.00 policy limits. Additionally, the judgment awarded legal interest, as follows: (1) Allstate was held liable for legal interest on the sum of $941,400.00 (ninety percent of plaintiffs' damages), subject to a credit for $22,317.85 for interest already paid (on its $100,000.00 policy limits), from date of judicial demand until October 4, 1993; (2) Virgie and Gordon Hutchinson, in solido, were held liable for legal interest on ninety (90) percent of the principal amount of the *1373 damages from October 4, 1993, until paid; and (3) Gordon Booty and State Farm were held liable, in solido with each other and with Virgie Hutchinson, Gordon Hutchinson, and Allstate, to the extent of fifty (50) percent of the legal interest on the principal amount from date of judicial demand until paid. Subsequently, Booty and State Farm filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial, which was denied by the trial court. Thereafter, Allstate, State Farm, and Gordon Booty appealed.

ISSUES
The following issue are raised on appeal by Mr. Booty and his insurer, State Farm.
1. Whether the trial court erred in instructing the jury that a driver claiming a sudden emergency must be the person in imminent danger?
2. Whether defendant, Gordon Booty, was exonerated from liability under the sudden emergency doctrine?
3. Whether defendant, Gordon Booty, had a duty to anticipate that another vehicle would not yield the right of way?
4. Whether the $225,000.00 jury award to Terry Whiddon for loss of consortium was excessive?
The issues raised by Allstate in its appeal are as follows:
1. Whether the trial court erred in holding Allstate was liable for legal interest on the full amount of the judgment rendered against its insurer from the date of judicial demand until Allstate paid its policy limits, with accrued interest, on October 4, 1993?
2. Whether the $225,000.00 jury award to Terry Whiddon for loss of consortium was excessive?
3. Whether Allstate is entitled to a credit against its interest liability for conventional interest earned on the funds it deposited into the court registry?

JURY INSTRUCTIONS

(Booty/State Farm Assignment of Error No. 1)
At trial, Mr. Booty asserted the defense of sudden emergency to justify his attempt to steer between the Hutchinson and Whiddon vehicles. He testified that when Mrs. Hutchinson turned in front of him, he observed that the passengers in her vehicle were children and feared for their safety if his truck hit the vehicle broadside. He explained that his decision to attempt to steer between the vehicles was based on his concern for the children's safety. Although he was aware of the danger of his own vehicle jack-knifing, he testified he did not fear for his own safety at that time.
On appeal, Mr. Booty and State Farm contend the trial court erred in giving additional instructions to the jury to the effect that the sudden emergency doctrine was applicable only if Mr. Booty found himself rather than another person in a position of imminent peril. The trial court's initial charge to the jury regarding the sudden emergency doctrine was as follows:
The law says that a person must find himself in a position of immediate peril, and that he does not have sufficient time to consider and weigh all of the circumstances or best means that may be adopted to avoid impending danger. And that his reaction, what he did, was a reasonable response to the emergency situation. And four, that the emergency was not brought about by his fault.
After beginning deliberations, the jury requested further instructions on the sudden emergency doctrine, presenting the court with the following question: "The question was, is only himself [Mr. Booty] in immediate peril?" The court responded:
Himself means him. So you've got to interpret that in the languagehimself doesn't mean others. If the laws meant to have others, they would say "suddenly found himself or others." It doesn't say that. It says that he suddenly finds himself in a position of immediate peril. Himself.
The jury resumed its deliberations, but then asked for additional instructions a second time. The following colloquy occurred at that time.

*1374 [Juror]: One of the questions we have, your honor, is thatdoes heand when I speak of he, I mean Mr. Bootyhave to be aware that he is in peril, or can we as a jury decide that he's in peril? Can you help us out with that?
The Court: When I had spoken to you a few moments about the four components of sudden emergency, I stated, no. 1, that he suddenly finds himself in a position of immediate peril. So, he would have to recognize that he finds himself in a position of immediate peril. So he would have to be cognizant of that.
[Juror]: He has to. Okay.
Defense counsel objected to each of these additional instructions. The jury subsequently returned a verdict assessing Mr. Booty with ten (10) percent fault.
We agree with defendants that the trial court's additional instructions were erroneous. The trial court's responses to the jury's questions reflect a misunderstanding of the sudden emergency doctrine. The sudden emergency doctrine is not limited to situations where the person claiming the benefit of the defense is the person in immediate peril. Rather, it is the unanticipated hazard which is the foundation for invoking the sudden emergency doctrine. Armstrong v. Fireman's Fund Ins. Co., 558 So.2d 646, 648 (La.App. 1st Cir.), writ denied, 560 So.2d 30 (1990); Fontenot v. Boehm, 512 So.2d 1192, 1194 (La.App. 1st Cir.1987). The rationale for the doctrine is the principle that a person confronted with a sudden emergency, who does not have sufficient time to weigh and consider the best means to avoid an impending danger, should not be held to the same standard of control, care, and caution as someone who has ample opportunity to fully exercise judgment and reason. Barbay v. Aetna Cas. & Sur. Co., 454 So.2d 181, 184 (La.App. 1st Cir.), writ denied, 457 So.2d 1181 (1984); Conley v. Continental Insurance Company, 270 So.2d 342, 345 (La.App. 1st Cir.1972), writ refused, 273 So.2d 42 (1973). This rationale applies equally, regardless of whether the person in imminent peril is the defendant claiming the defense or another person who the defendant recognizes to be in a position of imminent peril. Although numerous cases have used the language stating that the person claiming the sudden emergency must find "himself in a position of imminent peril", we have located no Louisiana cases limiting application of the doctrine in such a restrictive manner. To the contrary, several Louisiana cases have applied the sudden emergency doctrine in situations where the imminent danger created by the sudden emergency was to someone other than the person claiming the defense. See Conley, 270 So.2d at 345 [pedestrians crossing highway in imminent danger]; Kessinger v. Ashford, 165 So.2d 534, 539 (La. App. 1st Cir.1964) [child who darted into the street was in imminent danger]; Walker v. New Orleans Public Service, Inc., 245 So.2d 763, 764-65 (La.App. 4th Cir.1971) [two children on a bicycle were in imminent danger]. Accordingly, we conclude the trial court erred in instructing the jury that the sudden emergency doctrine applied only if Mr. Booty recognized himself personally to be in a position of imminent peril.
Where an improper jury charge contributed to the verdict, no weight should be given to that portion of the verdict. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1st Cir. 3/11/94), 634 So.2d 466, 489, writ denied, 94-0906 (La. 6/17/94), 638 So.2d 1094; Thibaut v. Thibaut, 607 So.2d 587, 599 (La.App. 1st Cir.1992), writs denied, 612 So.2d 37, 38, 101 (1993). In this case, we believe the trial court's erroneous instructions clearly contributed to the jury's verdict. The fact that the jury twice sought additional instructions on the point in question indicates it was an important factor in the jury's deliberations. Under these circumstances, we find the erroneous jury charges constituted error so prejudicial that no weight can be given to the jury's assessments of fault.
However, since the entire record is before us, we need not remand this matter to the trial court. This Court will reassess fault in *1375 this case by conducting a de novo review of the record. Id.

SUDDEN EMERGENCY DOCTRINE

(Booty/State Farm Assignments of Error Nos. 2 & 3)
At the time that Mr. Booty's truck collided with Mrs. Whiddon's van, his truck was in Mrs. Whiddon's lane of traffic. This fact creates a presumption of negligence from which Mr. Booty bears the burden of exculpating himself. Stapleton v. Great Lakes Chemical Corp., 627 So.2d 1358, 1361 (La.1993). In order to do so, Mr. Booty relies on the sudden emergency doctrine. Based on our independent review of the record, we believe the application of this doctrine exonerates Mr. Booty from any fault in the instant matter.
In Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385, 389 (1972), the Supreme Court explained the sudden emergency doctrine as follows:
One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.
In this case, Mr. Booty was not responsible for bringing about the emergency situation. He was driving within the 45 m.p.h. speed limit as he came around the curve in Sullivan road. He was maintaining a proper lookout and observed Mrs. Hutchinson's vehicle slowing to a stop, whereupon he took his foot off the accelerator, decreasing his speed slightly to approximately 40 m.p.h. He was then confronted with an emergency situation when Mrs. Hutchinson suddenly turned left into his lane of traffic. Mr. Booty was approximately one hundred feet from the Hutchinson car at that point and was faced with the imminent prospect of hitting it broadside.
We reject the argument of plaintiffs and their expert, Dr. Olin Dart, Jr., that Mr. Booty should have anticipated Mrs. Hutchinson's action and slowed his truck to approximately 30 m.p.h. when he first saw her. First, an oncoming motorist has a right to assume that a left-turning motorist will obey the law and will yield the right-of-way to the oncoming traffic. Percle v. Oubre, 564 So.2d 352, 357 (La.App. 1st Cir.), writs denied, 567 So.2d 611, 613 (1990); Terro v. Casualty Reciprocal Exchange, 93-593 (La.App. 3rd Cir. 2/2/94), 631 So.2d 651, 653, writ denied, 94-0522 (La. 4/22/94), 637 So.2d 157; Jones v. Lingenfelder, 537 So.2d 1275, 1281 (La. App. 2nd Cir.), writ denied, 539 So.2d 631 (1989). Moreover, in this case, the circumstances indicated that Mrs. Hutchinson would obey the law and yield the right-of-way, since she turned her left turn signal on and appeared to be slowing to a stop preparatory to yielding the right-of-way. Mr. Booty had no reason to anticipate that, after coming to a stop, Mrs. Hutchinson would almost immediately begin a left turn.
Faced with this sudden emergency, Mr. Booty immediately applied his brakes, but realized he would be unable to stop in time to avoid hitting the Hutchinson vehicle on the passenger side. Fearing in particular for the safety of the passengers should he hit the Hutchinson vehicle broadside, he decided to attempt to steer between the Hutchinson and Whiddon vehicles. He testified he realized he could not avoid hitting both vehicles, but hoped to strike only a glancing blow to each. However, when his brakes locked up, he lost control of the truck and ended up further across the center line than he had intended, which resulted in his truck hitting the front of the Whiddon van head-on.
Although Mr. Booty's actions may not have been the best course of action in hindsight and upon cool reflection, he did not have sufficient time to consider and weigh all the circumstances and decide upon the best means to avoid the imminent danger. In such a situation, a person is not required to exercise such control and degree of care as is *1376 required of a person who has ample opportunity to fully exercise reason and judgment. Barbay, 454 So.2d at 184; Conley, 270 So.2d at 345. Mr. Booty was faced with making an almost instantaneous decision. The fact that the maneuver attempted by Mr. Booty failed does not mean his actions were unreasonable. Given the circumstances Mr. Booty faced and the lack of time to make a fully considered decision, we find his actions in attempting to avoid hitting the Hutchinson vehicle broadside were reasonable, however unfortunate the results of those actions. Accordingly, we find Mr. Booty to be free of fault and assess Mrs. Hutchinson with one hundred (100) percent fault.[1]

LOSS OF CONSORTIUM

(Booty/State Farm Assignment of Error No. 4; Allstate Assignment of Error No. 2)
On appeal, all appellants argue the $225,000.00 award to Terry Whiddon for loss of consortium was excessive.
Because the trier-of-fact's discretion in assessing damages is so great, a damage award should be disturbed on appeal only when the award is, in either direction, beyond that which a reasonable trier-of-fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances of the case. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The compensable elements of a claim for loss of consortium include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Higley v. Kramer, 581 So.2d 273, 282 (La.App. 1st Cir.), writ denied, 583 So.2d 483 (1991).
In the present case, Mrs. Whiddon, who was thirty-three years old at the time of the accident, suffered brain damage as a result of the severe closed head injury she sustained. She was in a coma for sometime thereafter, and remained hospitalized for approximately one month, after which she was treated at the Baton Rouge Rehabilitation Center for two months. In order to spend more time with his wife, Mr. Whiddon took leave from work from the date of the accident through Mrs. Whiddon's first week at the rehabilitation center. Although Mrs. Whiddon's condition improved significantly after her release, at the time of trial she continued to suffer permanent residual problems, including some memory loss, deficiencies in depth perception, slurring of speech, and difficulties using the left side of her body, particularly her left hand and arm. When she first returned home, Mrs. Whiddon used a wheelchair to get around the majority of the time. However, she testified at trial that, although she has some problems walking and sometimes walks with a cane, she generally does not need a cane when walking at home or in familiar surroundings.
Since the accident, Mrs. Whiddon does not perform as many household tasks or as much cooking as she did previously. Further, Mr. Whiddon indicated his wife's injuries have caused a fundamental change in their relationship. Since the accident he and his wife are no longer equal partners in the relationship, and he sometimes feels more like a *1377 parent than a husband to her. He indicated his wife has become very dependent on him, even for making very minor decisions. He further stated that their sexual relationship is different since the accident. At the time of trial, Mr. and Mrs. Whiddon continued to attend monthly support meetings of the Louisiana Head Injury Foundation.
Despite the changes in the relationship, Mr. Whiddon testified he and his wife were still happily married and had a very good marriage. Further, Mrs. Whiddon testified her injuries have not negatively affected her relationship with her husband, although she does now "depend on him a lot."
Despite the severity of Charlene Whiddon's injuries and the residual problems she has experienced, we agree with appellants that the evidence does not support the $225,000.00 award made to Mr. Whiddon. The jury abused its discretion in making this award.
In Poche v. State Through DOTD, 93-0369 (La.App. 1st Cir. 3/11/94), 633 So.2d 913, 917, writ denied, 94-0851 (La. 5/13/94), 637 So.2d 1071, the plaintiff suffered a crushed vertebrae which caused permanent paralysis from the rib cage down. Plaintiff's wife was awarded $100,000.00 for loss of consortium.
In Bergeron v. Blake Drilling & Workover, 599 So.2d 827, 846-47 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (1992), this Court reduced an award for loss of consortium from $500,000.00 to $100,000.00, noting the reduced award was still one of the highest made. The plaintiff was injured in an explosion and hospitalized for forty-nine days. He lost his right leg below the knee and part of his left little finger. As a result, he has a permanent disability of ninety percent of the right leg, which translated to a thirty-six percent disability of the body as a whole. Additionally, he suffered a ten percent disability of his left hand and legal blindness in his right eye. Because of problems with the prosthesis for his leg, plaintiff often had to use a wheelchair. This Court concluded $100,000.00 was the highest amount the jury could reasonably award to plaintiff's wife for loss of consortium and, accordingly, reduced the jury award to that amount.
In Laing v. American Honda Motor Co., Inc., 628 So.2d 196, 207 (La.App. 2nd Cir. 1993), writ denied, 94-0375 (La. 3/25/94), 635 So.2d 239, the Second Circuit affirmed the granting of a JNOV reducing the award to plaintiff's wife for loss of consortium from $250,000.00 to $100,000.00, despite the Court's conclusion that plaintiff's injuries were the most significant factor in the couple's eventual divorce. The plaintiff in Laing suffered a severe traumatic brain injury and was in a coma for over two months. Mrs. Laing lived in the hospital waiting room from the time of the accident in November 1985 until February 1986. Plaintiff was unable to recognize his wife and child, and had to be told who they were. Upon his discharge in June 1986, plaintiff's wife had to feed and bathe him, and he had not yet regained bowel or bladder control. Because of the extensive care plaintiff required, it became necessary to send the couple's two-year-old daughter to live with relatives in another state. In October of 1986 Mrs. Laing felt she had done everything she could for her husband and she also moved out-of-state, leaving her husband in the care of his family. The couple eventually divorced.
In the present case, we find the jury award for loss of consortium to be unreasonably high under the circumstances, particularly the fact that, although Mrs. Whiddon's injuries unquestionably affected the couple's marriage, the couple continues to enjoy a very happy marriage. Under the circumstances, $100,000.00 is the highest amount which reasonably could have been awarded to Mr. Whiddon for loss of consortium.

INTEREST

(Allstate Assignment of Error No. 1)
At the time of the accident, Allstate had in effect an automobile liability policy issued to the Hutchinsons providing for $100,000.00 in liability coverage. The policy contained a *1378 supplemental payment provision, which provided Allstate would also pay, in addition to the liability limit, "interest accruing on damages awarded." It was under this provision that the trial court held Allstate liable for legal interest on the full amount of the judgment against the Hutchinsons. On appeal, Allstate argues it is not liable for legal interest on that portion of the judgment in excess of its policy limits because: 1) its obligation to pay interest terminated upon its deposit into the court registry of the policy limits, plus interest, on July 31, 1991; and (2) alternatively, Allstate cured any defect in its initial deposit and complied with the terms of the supplemental payment provision by paying the policy limits, plus interest, prior to the signing of judgment awarding damages to plaintiffs.
The following facts are relevant to a determination of these issues. On July 31, 1991, Allstate deposited its $100,000.00 policy limits, plus accrued interest of $3,518.82, into the court registry. Although Allstate's motion to deposit the funds stated the tender was made "unconditionally", Allstate simultaneously requested and obtained an order that the deposited funds "be held and withdrawn in accordance with law and after a determination of the validity of the claims of the plaintiffs and any other potential claimant." At the time of trial, the deposit remained in the court registry.
Following the return of the special jury verdict in plaintiffs' favor on July 21, 1993, the trial court declared the verdict legal and ordered it inscribed in the court minutes. Thereafter, on August 11, 1993, plaintiffs filed a motion to assess court costs and for a determination of legal interest due. The primary issue raised in plaintiffs' motion was whether the deposit of Allstate's policy limits on July 31, 1991 terminated Allstate's obligation to pay legal interest. A hearing on plaintiffs' motion was scheduled for September 14, 1993. The day before the scheduled hearing, Allstate filed and obtained an ex parte order releasing the deposited funds to plaintiffs. Plaintiffs' attorney actually received the funds from the Clerk of Court on September 22, 1993.
The minute entry for the September 14, 1993 hearing indicates the trial court assessed the Hutchinsons and Allstate with ninety (90) percent of the court costs and concluded they owed legal interest from the date of judicial demand. On October 4, 1993, Allstate made an additional payment of $18,799.03 to plaintiffs, representing the balance of interest due on the policy limits from date of judicial demand until that date. Thereafter, on October 15, 1993, plaintiffs filed a second motion for determination of legal interest due, contending Allstate was liable under the policy's supplemental payments provision for interest on "all sums awarded against its insureds, Virgie Hutchinson and Gordon Hutchinson, from date of judicial demand" until unconditional payment of its policy limits, plus legal interest. Following a hearing on November 12, 1993, the trial court ruled Allstate was liable for legal interest on ninety (90) percent of the judgment (the percentage of fault assessed against the Hutchinsons) from date of judicial demand until October 4, 1993 (the date of the final tender of interest on Allstate's policy limits, plus interest thereon). The final judgment in this matter was signed on January 14, 1994.
We will first consider Allstate's contention that the deposit of its policy limits on July 31, 1991 terminated its interest obligation under the policy.
A deposit must be unconditional in order to qualify as a valid tender. Purvis v. American Motors Corp., 538 So.2d 1015, 1020 (La.App. 1st Cir.), writ denied, 541 So.2d 900 (1989). It is well-established that for a tender to be valid the money must be placed into the power of the adverse party. If the money is deposited into the court registry, it must be done by the debtor with the intention that the creditor be at liberty to withdraw the money. Purvis, 538 So.2d at 1020-21; Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1029 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (1992).
Plaintiffs argue the deposit did not terminate Allstate's interest obligation because *1379 the deposit was not unconditional. In making this assertion, plaintiffs rely on the language of the order obtained by Allstate requiring the deposited funds be held and withdrawn "after determination of the validity of the claims of the plaintiffs and any other potential claimant." Since the trial court held Allstate liable for interest beyond the date of the deposit, the court obviously accepted plaintiffs' argument that the July 31, 1991 deposit was conditional. We find no error in this conclusion.
Although Allstate's motion to deposit the funds declared the deposit was made unconditionally, the same motion requested an order "forbidding withdrawal of the funds without a determination of the amount and validity of the competing claims[[2]]." In accordance therewith, the trial court signed an order prepared by Allstate's attorney stating the deposited funds were to be "held and withdrawn in accordance with law and after a determination of the validity of the claims of the plaintiffs and any other potential claimant." Consequently, Allstate's deposit did not constitute a valid tender terminating its interest obligation because it did not unconditionally place the deposited funds into plaintiffs' power.[3]
We now turn to Allstate's argument that it cured any defect in the initial deposit and satisfied the terms of the policy by paying its policy limits, plus interest, prior to the signing of the final judgment. In effect, Allstate's position is that the supplemental payment provision does not provide for the payment of pre-judgment interest on the excess judgment against its insureds when the policy limits are paid prior to the signing of judgment. Therefore, Allstate argues it owes plaintiffs no additional interest under this provision since it paid its policy limits, plus interest thereon, before the judgment against the Hutchinsons was signed.
Under La.R.S. 13:4203 all liability carriers owe interest on their policy limits from the date of judicial demand. However, this statutory provision does not prohibit insurers from limiting or extending their interest liability on excess judgments. Martin v. Champion Ins. Co., 95-0030, pp. 5-6 (La. 6/30/95), 656 So.2d 991, 995. As stated by the Supreme Court in Martin,
Insurers utilize supplemental payment provisions to outline their obligations with regard to interest. Thus, to determine an insurer's interest obligation on an excess judgment, we must refer to the supplemental payment provisions contained in the insurance contract. Martin, 95-0030, p. 6, 656 So.2d at 995.
In construing such provisions, the ordinary principles of contractual interpretation are applicable, since the policy is an agreement between the parties. If the language of the policy is clear and unambiguous, the agreement must be enforced as written. However, ambiguous provisions must be construed in favor of coverage and against the insurer which issued the policy. Sanders v. Ashland Oil, Inc., 94-1469, p. 6 (La.App. 1st Cir. 5/5/95), 656 So.2d 643, 647, writ denied, 95-1797 (La. 11/3/95), 661 So.2d 1389. In the present case, the supplemental payment provision of the Allstate policy provided Allstate would pay:
... interest accruing on damages awarded. We [Allstate] will pay this interest only until we have paid, offered, or deposited in court the amount for which we are liable under this policy. We will only pay interest on damages not exceeding our limits of liability.
Initially, we note that limitations such as that contained in the last sentence of this provision do not become effective until a valid tender or payment of the policy limits is *1380 made. McLemore v. Fox, 565 So.2d 1031, 1037 (La.App. 3rd Cir.), writs denied, 569 So.2d 966, 968 (1990). In this case, the final, unconditional tender by Allstate of the policy limits, plus interest thereon, did not occur until October 4, 1993, which was after trial was held and a jury verdict returned. Under these circumstances, the limitation included in the supplemental payment provision is not applicable in determining whether Allstate owed interest on the excess judgment prior to October 4, 1993.
The supplemental payment provision makes no reference to when interest on the damages awarded begins to accrue. However, it has been held that policy language providing for the payment of interest on damages owed as the result of a judgment, without stating when the interest begins to accrue, requires the payment of pre-judgment interest on the excess judgment from date of judicial demand. Martin, 95-0030, 656 So.2d at 995; McLemore, 565 So.2d at 1037-38; Fowler v. Roberts, 526 So.2d 266, 280-81 (La.App. 2nd Cir.1988), affirmed, 556 So.2d 1 (1989). These cases are in contrast to those cited by Allstate, in each of which the supplemental payment provision specifically provided the insurer would pay "interest accruing after a judgment is entered ..." (emphasis added). See Nicholes v. St. Helena Parish Police Jury, 604 So.2d at 1028; Malbrough v. Wallace, 594 So.2d 428, 438 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (1992). The Allstate supplemental payment provision contains no such language, providing merely that Allstate will pay "interest accruing on damages awarded."
Based on our review of the jurisprudence, we believe the language of the Allstate supplemental payment provision requires the payment of interest on the excess judgment, as well as the policy limits, from date of judicial demand. A plain reading thereof does not support Allstate's position that the provision applies only to interest on the excess judgment which accrues after the signing of judgment. Since the language of this provision could, at most, be said to be ambiguous on this point, it must be construed against Allstate. Accordingly, we find no error in that portion of the trial court judgment holding Allstate liable for interest on the entire judgment rendered against its insured from date of judicial demand until October 4, 1993.

CREDIT FOR EARNED INTEREST

(Allstate Assignment of Error No. 3)
Finally, Allstate argues the trial court erred in not giving it a credit for conventional interest earned on the funds it deposited into the court registry from the time of the deposit until the time the funds were released to plaintiffs. The record reveals that on July 31, 1991, Allstate deposited $103,518.82 (consisting of the $100,000.00 policy limits plus interest thereon from date of judicial demand) into the court registry. On September 22, 1993, plaintiffs received the sum of $111,308.02 from the Clerk of Court pursuant to an order of the trial court releasing the deposited funds. The $7,789.20 difference between the original deposit and the amount released to plaintiffs was comprised of conventional interest earned on the funds while in the court registry. Allstate argues it is entitled to a credit against its interest obligation in this amount. In opposition, plaintiffs do not dispute Allstate's right to such a credit, but argue Allstate should not be allowed to raise this issue for the first time on appeal.
Under the circumstances of this case, we conclude Allstate is entitled to credit against its interest obligation for the interest earned on the deposited funds. La.C.C.P. art. 2164. Plaintiffs otherwise will receive a windfall to which they are not entitled by receiving both conventional interest and legal interest on the deposited funds for the same time period. See Palmer v. Goudchaux/Maison Blanche, Inc., 613 So.2d 704, 708 (La.App. 5th Cir.), writs denied, 616 So.2d 698, 699 (1993).

CONCLUSION
For the above reasons, that portion of the trial court judgment assessing Mr. Booty *1381 with ten (10) percent fault is reversed and Mrs. Hutchinson is hereby assessed with one hundred (100) percent fault. That portion of the judgment in favor of plaintiffs and against Mr. Booty and State Farm is reversed and judgment is hereby rendered dismissing plaintiffs' claims against Mr. Booty and State Farm. Additionally, the judgment of the trial court is amended as follows: (1) to increase the liability of Virgie and Gordon Hutchinson for the principal damages, interest and trial court costs from ninety (90) percent to one hundred (100) percent; (2) to increase that portion of the judgment upon which Allstate is liable for legal interest from ninety (90) to one hundred (100) percent of the principal judgment, from date of judicial demand until October 4, 1993, subject to a credit of $30,107.05; (3) to increase Allstate's liability for trial court costs (for which it is liable in solido with Virgie Hutchinson and Gordon Hutchinson) from ninety (90) to one hundred (100) percent; and, (4) to reduce the award to Mr. Whiddon for loss of consortium from $225,000.00 to $100,000.00. The judgment of the trial court is affirmed in all other respects. The costs of this appeal are to be paid by the Hutchinsons and Allstate.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART AND RENDERED.
NOTES
[1] None of the parties have raised any issues on appeal regarding the determination that Mrs. Hutchinson was at fault. Her fault is, in fact, quite clear. A motorist making a left turn has a strong duty of care which requires not only looking before turning, but also seeing what is observable. Barlow v. State Farm Mut. Auto. Ins. Co., 93-2385, p. 5 (La.App. 1st Cir. 11/10/94), 645 So.2d 1256, 1259, writ denied, 94-2980 (La. 2/3/95), 649 So.2d 406. There is a presumption that a left-turning motorist is negligent if he has executed a left-hand turn and crossed the center line at the time of impact. La.R.S. 32:104A; Miller v. Leonard, 588 So.2d 79, 81 (La.1991). In the present case, although Mrs. Hutchinson testified she did not see Mr. Booty's truck until it was right on her, she has offered no explanation for her failure to see it earlier. The accident occurred during mid-afternoon and there were no obstructions to Mrs. Hutchinson's visibility. Based on our review of the record, we find Mrs. Hutchinson was solely at fault in causing the accident.
[2] No competing claims were ever filed.
[3] Allstate's reliance on Purvis v. American Motors Corp., supra, in support of its position is misplaced. In Purvis this Court held that language of an order providing that deposited funds were to be held subject to further orders of the court did not render the tender made therein conditional. Contrary to Allstate's assertions, however, the order in the present case is more restrictive than the order in Purvis, since it goes beyond merely ordering that the funds be held subject to further order of the court.