[JAMES L. CANNELLA, Judge.
The Defendants, Herbert Matthews (Matthews) and Zurich American Insur- *802 anee Company (Zurich), appeal a Judgment Notwithstanding the Verdict (JNOV) in favor of the Plaintiff, Jeffrey W, Clark. The JNOV increased portions of the jury’s award for compensatory and punitive damages in an automobile accident case involving an intoxicated driver. We reverse in part, affirm in part, and amend in part.
, On March 24, 2001, the Plaintiff was traveling southbound on Powers Drive (Powers) in Metairie, Louisiana in a car owned by his employer, Canandaigua Wine Company. At the intersection of West Esplanade Avenue and Powers, he, stopped at a red signal light. When the light turned green, the Plaintiff started across the intersection, but was struck head-on by a vehicle driven by Matthews. Although the Plaintiff was wearing his seatbelt and his airbag deployed, his head struck the windshield. Matthews was intoxicated with cocaine and alcohol at the 13time. The Plaintiff was taken to a hospital emergency room and later released. He suffered a concussion, a chest contusion, a broken bone in the spinous process in the thoracic back, three ruptured discs, and other minor injuries. Two of the disc injuries were to the thoracic spine and one to the lumbar spine.
In May of 2001, the Plaintiff filed suit against Matthews, his insurer, Allstate Insurance Company (Allstate), and Zurich, the Plaintiffs employer’s underin-sured/uninsured (UM) motor insurance carrier. Liberty Insurance Company (Liberty), the Plaintiffs UM insurer was added as a Defendant in June of 2002. The Plaintiff included in the petition for damages a claim for punitive damages because of Matthew’s intoxication.
In December of 2001 and August of 2003, Zurich was dismissed, from the punitive damage part of the claim and from liability for interest on any punitive damage award. In August of 2002, Allstate was dismissed from the lawsuit. In March and August of 2003, Matthews, Zurich and Liberty filed stipulations into the record that Matthews was solely at fault in the accident.
A jury trial was held on damages on October 27, 28, 29 and 30 of 2003. The jury awarded the Plaintiff $12,500 for punitive damages, $60,000 for physical pain and suffering, $60,000 for mental pain and suffering, $15,279.86 for past medical expenses, $165,000 for future medical expenses, and $99,720.14 for past and future lost earning capacity, for. a total of $400,000. The judgment rendered on November 18, 2003, credited Zurich with payments of $140,000 paid prior to trial and the unconditional tender to Plaintiff of $265,000 made post-trial. Liberty was dismissed with prejudice.
The Defendants subsequently filed a motion for new trial and/or remittitur. The Plaintiff filed a motion for JNOV and/or New Trial. In March of 2001, the trial judge denied the Defendants’ motion and granted the Plaintiffs motion for 14JNOV, raising the awards for punitive damages from $12,500 to $200,000, (with a credit for $10,000 paid by Matthews insurer), for physical pain and suffering from $60,000 to $175,000 and for past and future lost earning capacity from $99,720.14 to $379,433. The other awards remained as awarded in the initial judgment. The increased awards raised the total to $794,712.86, with a credit to the Defendants for a stipulated payment made by Zurich to the Plaintiff of $140,000 prior to trial, and a stipulated unconditional tender made by Zurich of $265,000 after trial, but before the jury returned with a verdict. The judgment cast Zurich for judicial interest on $794,712.86 from date of judicial demand, subject to the above credits.
On appeal, the Defendants assert that the trial judge erred first- by precluding *803 the presentation of a surveillance video, thus necessitating a de novo review on appeal. The Defendants next contend that the trial judge erred by failing to apply the proper standard for a JNOV and by granting the JNOV on the pain and suffering award. The Defendants also assert that the jury erred in awarding the Plaintiff $165,000 in future medical expenses. Zurich further asserts that the trial judge erred by improperly assessing judicial interest on the entire JNOV judgment against it when Zurich had tendered a total of $405,000 by the time the judgment was signed. Zurich also appeals the assessment of costs. Matthews appeals the increase in punitive damages.
PENDING MOTION FOR NEW TRIAL
Upon reviewing the record, we first note that the trial judge failed to rule on the Plaintiffs motion for new trial after granting the JNOV, as required by La. G.C.P. art. 1811.[1] Nevertheless, we decline to remand this particular matter to the | ^district court for it to rule on the motion for new trial because such an action would be contrary to the concept of judicial economy and the interest of the parties in having this lawsuit concluded. See: Trunk v. Medical Center of Louisiana at New Orleans, 04-0181 (La.10/19/04), 885 So.2d 534; Cao v. Schaffer, 04-242, p. 13 (La.App. 5th Cir.8/31/04), 881 So.2d 1277, 1285.[2]
SURVEILANCE VIDEO
The Defendants contend that the trial judge excluded the introduction of a surveillance video because the Plaintiff was not provided a copy in discovery proceedings. The Défendants contend that the trial judge erred in not admitting the tape because it was to be used for impeachment evidence, which does not have to be disclosed, and because the Plaintiff failed to ask for any video surveillance tapes in his discovery requests. The Defendants cite Detillier v. Smith, 94-34 (La.App. 5th Cir.5/31/94), 638 So.2d 445. The Plaintiff contends that surveillance tapes were included in his discovery request for the “production of investigator’s reports.”
Following the Plaintiffs objection to the admission of the tape during trial, the trial judge determined that the Plaintiffs request for investigative reports submitted to the Defendants’ prior to trial included the discovery of any video tapes of the Plaintiff. In addition, he concluded that, although counsel for Matthews did not per *804 sonally have the tape, he was shown the tape prior to trial and |fiused the information on it for cross-examination. The judge concluded that neither the information on the tape nor the tape could be used because they were not disclosed prior to trial.
In Detillier, the videotape was made during the trial. It was screened outside of the jury’s presence by the judge and the parties’ attorneys. It was admitted there because the video was impeachment evidence and because .the Plaintiff had not requested discovery of any surveillance. Here, the Plaintiff requested disclosure of investigative reports. Thus, Detillier is inapplicable to our facts.
 La.C.C.P. art. 1422 provides that any relevant matter, not privileged, is discoverable. Even information which will be inadmissible at trial, but that is “reasonably calculated to lead to the discovery of admissible evidence” is discoverable. Under this broad rule, surveillance videotape is discoverable material, which should be turned over a reasonable amount of time before trial. Wolford v. JoEllen Smith Psychiatric Hospital, 96-2460, p. 2 (La.5/20/97) 693 So.2d 1164, 1166. Video tapes are discoverable, whether or not they will be used at trial. Moak v. Illinois Cent R. Co., 93-0783, p. 6 (La.1/14/94), 631 So.2d 401, 405.
In Wolford, the court noted that a surveillance videotape ostensibly picturing a personal injury plaintiff engaged in physical activity is highly relevant to the plaintiffs claim for damages as the result of physical injury and that it could be used as substantive, corroborative, or impeachment evidence at trial. Wolford, 96-2460 at 2, 693 So.2d at 1166. The court further stated that the requirement that a surveillance videotape be disclosed a reasonable time before trial “is consistent with the modern trend broadening the scope of discovery and narrowing the attorney work product exclusion from discovery” and “advances the objectives of pre-trial discovery — to discover and obtain facts pertinent to the litigation, to assist 17in trial preparation, to narrow and clarify issues,'and to facilitate settlement and abandonment of less than meritorious claims.” Wolford, 96-2460 at 3, 693 So.2d at 1166. It also allows the plaintiff the opportunity to examine the video for authenticity and to expose any misrepresentation, in a medium that is especially susceptible to manipulation and distortion. In addition, although the defendant is not required to volunteer any information, a defendant must respond, either in the affirmative or the negative, to an interrogatory inquiring about the existence of surveillance videotape. Id. The trial judge has great discretion as to whether a surveillance video will be admitted at trial. Olivier v. LeJeune, 95-0053, p. 10 (La.2/28/96), 668 So.2d 347, 351.
In this case, we agree with the trial judge that the discovery of any surveillance by the Defendants was included in the request for discovery by the Plaintiff. Furthermore, the Defendants had an obligation to provide the tapes for the Plaintiffs’ inspection within a reasonable time before trial, regardless of the reason that the Defendants intended to use it. In addition, photographs from the tape were shown to the Defendants’ medical expert, Dr. David Aiken, Jr. over two months pri- or to trial, which, according to Dr. Aiken, caused him to change his opinion. Not until trial did the Plaintiff discover that Dr. Aiken’s testimony would reflect that the photograph taken from the surveillance video affected his opinion and caused him to change his mind about an aspect of the Plaintiffs injuries. This surprise discovery violates the objectives of pre-trial discovery and was unfair to the Plaintiff. *805 Thus, we find no abuse of the trial judge’s discretion in excluding the videotape or information disclosed in that tape.
JNOV
 A JNOV is warranted when facts and inferences point so strongly in favor of one party that reasonable men could not arrive at a contrary verdict, not merely Iswhen there is a preponderance of evidence for the mover. Joseph v. Broussard Rice Mill, Inc., 00-0628, p. 4 (La.1/30/00), 772 So.2d 94, 99; Cao, 04-242 at 6, 881 So.2d at 1281; Mills v. Jaume, 02-668, p. 4 (La.App. 5th Cir.12/11/02), 836 So.2d 282, 285. If the evidence opposed to the motion is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Joseph, 00-0628 at 4, 772 So.2d at 99; Cao, 04-242 at 6, 881 So.2d at 1281; Mills, 02-668 at 4, 836 So.2d at 285. In making the determination, we should not evaluate the credibility of witnesses and all reasonable inferences of factual questions should be resolved in favor of the non-moving party. Joseph, 00-0628 at 4, 772 So.2d at 99; Cao, 04-242 at 6, 881 So.2d at 1281; Mills, 02-668 at 4, 836 So.2d at 285.
1. Physical Pain and Suffering and Future Medical Expenses
The trial judge increased the award for future pain and suffering from $60,000 to $175,000. The evidence shows that the Plaintiff suffered a broken bone in the thoracic or mid-back area and three ruptured discs as a result of the accident. He had a concussion and other injuries that healed within months of the accident. The Plaintiff was taken from the accident scene to the hospital by ambulance, treated and released and then asked to return when it was discovered he had a broken bone, which has since healed. The Plaintiff was subsequently treated for low back pain due to the lumbar disc and mid-thoracic burning, pain and muscle spasms. He saw Dr. Robert Shackleton, an orthopedic surgeon, one time, then Dr. Charles Billings, an orthopedic surgeon, in April, June, August, October, December of 2001 and March of 2002. He was referred by Dr. Billings to Dr. Joseph Crapanazano, the Plaintiffs current pain management doctor, in November of 2001. He began treatment with Dr. John Schumacher, a. neurosurgeon and his current treating doctor, since March of 2002. In January of 2002, the Plaintiff was ^examined on one occasion by Dr. David Aiken, an orthopedic surgeon, at the request of the Defendants. The Plaintiffs only prior medical problems relate to allergies and hormonal deficiencies, for which he was being treated at the time of trial.
Throughout the years of his care for the injuries related to his accident, the Plaintiff consistently complained of burning pain in the mid and low back. During Dr. Billings’s treatment of the Plaintiff, it was discovered that the Plaintiff suffered three herniated discs in the accident, two in the thoracic area and one in the lumbar spine. The herniated discs at T7-T8 and L5-S1 are surgically significant and the cause of the Plaintiffs continuing pain. All doctors agreed that there are special concerns with the ruptured thoracic disc because it is pressing on and flattening the spinal cord. The spinal cord runs down the mid-back, ending at the first lumbar vertebra. The doctors further agree that thoracic disc ruptures are rare, unusual, or uncommon because a considerable amount of force is necessary to herniate a thoracic disc due to its encasement within the rib cage.
According to Dr. Schumacher, it is unlikely that either disc problem will improve without surgery. He testified that the thoracic disc herniation is more problematic than the lumbar disc, because there is a *806 risk of paralysis with or without surgery. Dr. Schumacher explained that the thoracic space is much smaller than in the lumbar region, so there is a potential for further injury to the spinal cord. In addition, thoracic surgery is also more complicated than lumbar surgery. A chest surgeon is required to open the area and move the ribs in order to access the disc. Because of the blood supply in that area, complications from the surgery are usually more severe. Without the surgery, any new forceful trauma to the area can cause paralysis due to the. pressure from the disc on the spinal cord. Dr. Schumacher assessed the Plaintiff with 25-30% full body disability. . He |inrestricted Plaintiff to light lifting, bending, pulling and pushing of no more than 30-50 pounds. Dr. Billings deferred to Dr. Schumacher in regard to his conclusions.
The Plaintiff testified that he has delayed undergoing the two surgeries due to his concerns about the risk of paralysis, but both he and Dr. Schumacher expect that he will eventually have to have them. Dr. Schumacher would perform the lumbar surgery first, replacing the disc with bone, and possibly inserting metal screws and a rod. The Plaintiff would be hospitalized for 5-7 days, with 6-12 months recovery for a solid fusion. He could perform sedentary work within 2 months, depending on his work requirements. During his recovery, he would not be able to travel by air, a requirement for his job. In regard to the thoracic surgery, Dr. Schumacher stated the chest surgeon would enter the body one of three ways: through the ribs into the chest cavity, during which the rib must be retracted; from the side, taking out a portion of the rib and moving the lung while trying not to open the pleura; or from the posterior side of the body. The estimated cost of the surgeries for Dr. Schumacher’s fee and a low end estimate for the hospital bill is $67,000. That figure does not include medications and the fees for the other doctors that will be involved in both surgeries. There will also be future medical expenses, including office visits, and diagnostic tests, including MRI’s. An MRI costs approximately $1,000 and office visits for Dr. Schumacher range from $50-$75. Dr. Schumacher related the injuries to the accident.
Dr. Aiken agreed with Dr. Schumacher that surgery on the Plaintiffs thoracic disc is a reasonable solution for that rupture. He also stated that surgery on the lumbar region is within appropriate treatment, although he would continue with conservative treatment and not operate on the lumbar disc. He also testified that surgery can sometimes be avoided because scar tissue that forms in a ruptured disc can resolve the pain. The disc protrusion can also shrink over time. However, 1 ^he noted that, based on the Plaintiffs condition, neither of those natural healing processes have occurred at this time.
During the three years prior to the trial, the Plaintiff underwent conservative treatment, consisting of physical therapy and medications. The testimony showed that his pain waxes and wanes depending on the level of activity and the weather. At one point, he told Dr. Billings that he was improving, but the Plaintiff testified that he was referring to the other injuries from the accident. Since then, Dr. Crapanzano has performed four epidural injections in the lumbar region and one in the thoracic regions. The injections consist of a local anesthetic combined with a steroid solution to decrease the inflammation. Although the injections have temporarily helped the low back pain and the Plaintiffs radiating leg pain, it has little effect on the thoracic pain. Dr. Crapanzano indicated that other options he can offer the Plaintiff include a discogram to identify the specific disc level causing the pain, and alternative treat *807 ments, such as a Nucleoplasty, in which electron beams are focused to create a plasma field to attempt to vaporize or decompress the disc, an IDET which attempts to shrink the disc through heat application, or a Doral Root Ganglion Radio Frequency Lesioning, where the nerve input at the entry to the spinal cord is exposed to electromagnetic energy in an attempt to reduce the leg pain. Dr. Schu-macher does not expect these alternative treatments to work, but thinks that the Plaintiff can try any of those treatments if he feels he would benefit from them. The alternate procedures range from several hundreds of dollars to several thousands of dollars per disc level. Depending on the procedure, the recovery period ranges from immediately to several weeks.
Although nerve conduction studies were negative, all of the doctors testified that the Plaintiffs complaints of pain in both spine areas are legitimate and consistent with the herniations and that he is sincere and not malingering. Dr. |12Schumacher referred to him as an “honorable man.” His complaints of mid .and low back pain, with radiating leg pain have not changed since the accident. Motrin helps the pain, but he also takes a non-narcotic pain medication and oral steroids.
The evidence also shows that the Plaintiff has continued to work and to travel for both business and pleasure. He has taken domestic and international family trips. The Plaintiff explained that long plane and car trips cause him discomfort; but he takes pain medications,' moves around as much as possible to avoid sitting for long periods, and rests as needed. The Plaintiff further testified that he had to go on the business trips. He also stated that the pain has affected his ability to participate in physical family activities and hobbies, such as golf, and interferes with his ability to lift his seven year old daughter and swim with her. The Plaintiff is more easily aggravated due to his pain, which affects his wife and children, and his sexual relations with his wife have been impaired.
The Plaintiffs wife testified that the Plaintiff has difficulty performing physical household tasks. Prior to the accident, he was healthy, enjoyed fishing, golf, swimming with his young daughter and playing basketball with his teenage sons. She noted that some days he is miserable due to the pain, which impairs his ability to work. He often lays on the floor to relieve the pain. Mrs. Clark noted that the Plaintiffs two sons from a prior marriage are college age now and can do a lot of the heavy work around the house. ■
Mrs. Clark testified that the Plaintiff flew to Chicago on a business trip shortly after the accident. However, he was sent home early because of his condition. He and the family went to Italy in May of 2001, to Orlando (Disneyworld and Epcott) in June of 2001 for a business meeting, which they combined with a family vacation trip. In June of 2001 they went to Destín, Florida for the family’s regular vacation. In September of 2001, the Plaintiff traveled to | ^Kentucky several times to watch his son play football. He also went to Houston for a business meeting. Mrs. Clark noted that he was able to enjoy his trip to Italy only by taking pain medications and resting when he had an opportunity. In addition, while he attended some Mardi Gras parades after the accident, Mrs. Clark stated that he sits in a lawn chair and she handles their ladder, as it is on wheels. Mrs. Clark noted that the Plaintiff is frustrated with his condition causing him to be irritable. She said that his back always hurts, but he controls it with pain medications.
The Plaintiff is facing two separate major surgeries, one of which is complicated and riskier-than normal. He will most *808 likely have metal screws and a rod placed in his back in the lumbar region. His recovery will likely be lengthy, if a fusion is necessary for the lumbar disc. In an effort to delay the surgeries, he has undergone spinal injections, uses medication for his pain, and may incur the discomfort of alternative treatments that have varying degrees of recovery time. While the evidence focused on the Plaintiffs residual problems in his back, he also suffered pain for several weeks from a broken bone in the thoracic back area, a concussion and contusions from the impact of the accident. The testimony shows that the Plaintiff tries to live a normal life despite his pain. Based on the evidence in this case, we find that the trial judge did not err in granting the JNOV and increasing the award for physical pain and suffering, as the proven facts and inferences point so strongly in favor of the Plaintiff that reasonable men could not arrive at a contrary verdict.
2. Future Medical Expenses
The trial judge did not change the jury’s award of $165,000 for future medical expenses. We find that reasonable men could arrive at this verdict. Therefore, we affirm the ruling of the trial court on this item of damages.
[ 143. Loss of Earning Capacity
The trial judge also increased the jury’s award for loss of earning capacity from $99,720.14 to $379,433. In this regard, the evidence shows that the Plaintiff works as a district sales manager for Can-andaigua Wine Company. The job requires air and car travel, but he has an office at home where he works when he is not traveling. Working at home allows him to rest as needed for pain. He averages 300-350 miles per week in car travel. Although the Plaintiffs workload has increased since the accident due to a corporate change and he has missed time from working at home due to doctor visits, the Plaintiff has kept up with his workload. The Plaintiff has received good performance ratings since the accident, and has received annual bonuses every year. The bonuses are awarded by the company based on performance. He has not suffered any diminution of his wages. The Plaintiffs career goal prior to the accident was to become a regional manager. However, he did not apply when vacancies arose following the accident because he felt unable to increase the travel involved in the job. In addition, he also stated that he did not intend to apply for the job until after his younger son graduated from high school. That would have been within three years or so after the accident.
Robert Skinner, a certified public accountant (CPA) and economic loss projection expert calculated loss earning capacity based on the difference between his income as a district sales manager and a regional sales manager. He concluded that the Plaintiffs lost earning capacity as related to the regional manager’s job over his work life expectancy was $379,433. The trial judge accepted this testimony and he increased the loss of earning capacity award. However, we find that the trial judge erred in this respect under the burden of proof required for JNOV. The facts and inferences do not point so strongly in favor of the Plaintiff for the increased award that reasonable men could not arrive at a contrary verdict. | ^Accordingly, we will reverse this portion of the JNOV and reinstate the jury verdict..
4. Punitive Damages
The Defendant, Herbert Matthews, appeals the increase by the trial judge of punitive damages. He contends that the jury did not abuse its discretion in the award of $12,500.
*809 La.C.C. art. 2315.4 provides that “exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries.” The amount of the award is discretionary with the factfinder.
The evidence was clear that Matthews was intoxicated and on cocaine when the accident happened. The jury concluded that $12,500 was sufficient to penalize Matthews for his conduct. While we might have awarded a greater amount as the factfinder, for the purposes of the JNOV, the facts and inferences do not point so strongly in favor of the Plaintiff for the increased award that reasonable men could not arrive at a contrary verdict. Accordingly, we will reverse this portion of the JNOV and reinstate the jury verdict.
JUDICIAL INTEREST
The Defendants assert that the trial judge erred in assessing judicial interest against them because the Plaintiff failed to reserve his rights when he dismissed Allstate from the suit, or alternatively, that one-half of the interest should have been credited as Allstate’s portion of interest on the judgment.
1. Reservation of the Plaintiffs Right to Judicial Interest
First, we note that the record does not contain any document reflecting the terms of the “settlement” with Allstate or its conditions, other than a motion to |! (¡dismiss Allstate by the Plaintiff. In the motion to dismiss Allstate, the Plaintiff does not state the reason for the dismissal, but does reserve his rights against Zurich. At trial it was stipulated that Allstate paid its policy limits of $10,000 to the Plaintiff, plus interest. We find that reservation sufficient to preserve his right to judicial interest.
2. Allstate Policy
 The-Defendants next contend that under the Allstate policy, it is obligated to pay interest for “damages awarded.” They cite Whiddon v. Hutchinson, 94-2000 (La.App. 1st Cir.2/23/96) 668 So.2d 1368, alleging that the First Circuit Court of Appeal found an identical provision ambiguous, thus holding that Allstate was liable for payment of pre-judgment interest on the excess judgment (limits were $100,000 and the judgment was for $941,400) from date of judicial demand. Thus, the Defendants argue, had Allstate remained in the case, it would have been liable jointly as a solidary obligor for the amount of interest on the entire judgment. Since the Plaintiff settled with Allstate, the Defendants argue that Zurich is the beneficiary of the compromise and is liable only for its virile share, or one-half of the interest owed.
The policy provision cited by the Defendant states in part that Allstate will “only pay interest on damages not exceeding our limits of liability....” Although the Whid-don case involved identical language, the court there noted that this provision is effective only when a tender is made or the claim paid. Apparently the court meant prior to trial, because there, Allstate made a conditional tender prior to trial which did not stop interest from running, because it was not unconditional. Allstate then made an unconditional tender after trial, but before judgment, and argued that the unconditional tender was retroactive to the date of the conditional tender. That is not the case here... Furthermore, although the court found the above 117provision ambiguous, the ambiguity only related to the date interest would commence under the policy terms. Because the policy was silent in that regard, the court held that interest *810 ran from date of judicial demand. We are not concerned here with the commencement date of the interest. Thus, the facts in Whiddon are distinguishable and the Allstate policy does not entitle the Defendants to relief.
3. Unconditional Tenders
In addition, the Defendants argue that Zurich is entitled to a credit for interest on amounts that they tendered unconditionally prior to trial. They contend that interest stops running on the date an unconditional tender is offered. Further, interest on the reduced amount begins anew from the date of the tender until the date that the judgment is satisfied. See: Ridenour v. Wausau Ins. Co., 627 So.2d 141, 143 (La.1993); La.R.S. 13:4203. The Defendants contend that Zurich made the following tenders: February, 6, 2002 for $35,000, August 9, 2002 for $105,000, and October 31, 2003 for $265,000.
Our review of the record does not contain a copy of the tenders or other evidence that the specific amounts were paid on the dates alleged by the Defendants. The only reference to the pre-trial tender is made at the commencement of the trial and again during the trial where the parties stipulated that the Defendants tendered and paid to the Plaintiff a total amount of $140,000. The parties do not specify how or when the $140,000 was tendered. The specifics are listed only in the Defendants’ appellate brief. However, the appellate court can only consider evidence in the record. Without evidentiary proof of those dates and amounts, we cannot determine when and if the tenders were made. Because we cannot determine when the prior tender(s) were made, we are unable to determine if the trial judge erred and if Zurich is entitled to relief from interest on that amount. For the same reason, a lack of evidence of dates, we cannot calculate |lgwhen the interest stopped on the post-trial amount. Based on the foregoing, we find that the trial judge did not err in his assessment of interest.
COSTS
The Defendants further assert that the judgment following the jury verdict ordered the costs to be divided between the. Defendants in “equal shares.” The JNOV was silent in this regard, other than to state that “the defendants are to pay court costs in the sum of $15,561.44.” Since the Plaintiff did not seek review of the court costs in the motion for JNOV, Zurich argues that the JNOV should be amended to reflect that each Defendant pay court costs in equal shares. We agree. It does not appear that the trial judge intended to modify the original judgment relative to costs. Thus, the judgment will be amended to reflect the original division of costs.
Accordingly, the JNOV is hereby reversed in regard to the increase in loss of earning capacity and punitive damages, and the jury awards are reinstated for those items. The JNOV is affirmed in all other regards. The JNOV is amended to order trial costs to be divided equally between the Defendants. Costs of this appeal are to be divided between the Defendants in equal shares.

REVERSED IN PART, AFFIRMED IN PART AND AMENDED IN PART.

. La. C.C.P. art. 1811 provides in pertinent part:
(A). (2) A motion for a new trial may be joined with this motion [JNOV], or a new trial may be prayed for in the alternative.***
(C). (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial,’ if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
(3) If the motion for a new trial has been conditionally denied and the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

. In the past, this Court remanded for a determination of the new trial issue, finding that we had no jurisdiction while the new trial motion was pending. See: Petranick v. White Consolidated Indus., 03-483, pgs. 3-4 (La.App. 5th Cir.9/30/03),857 So.2d 1232, 1233; Eubanks v. Salmon, 98-941, p. 4 (La.App. 5th Cir. 1/5/99), 726 So.2d 430, 432; State Through DOTD v. Scramuzza, 594 So.2d, 517, 521 (La.App. 5th Cir. 1992).