627 So.2d 1358 (1993)
Johnny STAPLETON, et ux
v.
GREAT LAKES CHEMICAL CORPORATION, et al.
Nos. 93-C-1355, 93-C-1459.
Supreme Court of Louisiana.
November 29, 1993.
Dissenting Opinion December 7, 1993.
Rehearing Denied January 6, 1993.
*1359 Curtis D. Street, Monroe, for applicant.
Esmond Phelps, II, Dane S. Ciolino, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Fred W. Jones, Robert E. Shadoin, Smith & Shadoin, Ruston, Lisa C. Rogers, Susan N. Belsom, Crawford & Anzelmo, Phillip D. Myers, Walter C. Dunn, Jr., Theus, Grisham, Davis & Leigh, Monroe, for respondent.
WATSON, Justice.[1]
A car skidded off an icy road, a pickup truck stopped to render aid, two tractor-trailers arrived at the scene, one eighteen-wheeler jackknifed into the other and this suit ensued. Plaintiff, Johnny Stapleton, was badly injured when the trailer of a truck driven by Max Henderson crossed into Stapleton's lane of travel. Stapleton brought a tort claim, Mrs. Stapleton sued for loss of consortium and his employer's insurer intervened to recover worker's compensation benefits. A divided jury found Henderson and the pickup driver, Brown, free of fault. The jury did not reach the issue of Stapleton's fault. The trial judge, who decided the intervention, assessed Henderson and Stapleton's fault each at fifty percent. A divided court of appeal reversed the trial judge's intervention decision but affirmed the jury's verdict. Stapleton v. Great Lakes Chemical Corp., 616 So.2d 1311 (La.App.2d Cir.). A writ was granted. 620 So.2d 856 (La.1993).

FACTS
On January 9, 1988, Stapleton was driving a loaded propane tank truck for Martin Gas Company. He was travelling south from Dubach on Highway 167 near midnight. The weather was freezing, and the road was icy. Stapleton crossed a bridge, saw a woman walking and broadcast a warning on his CB radio. Coming out of a curve, Stapleton entered a straight section of highway approximately 1,600 feet long. The two-lane highway widened into two south and one north. Stapleton stayed in the middle lane. The straightaway ends at another curve to the south. Stapleton saw a pickup, driven by Christina Brown, slowed or stopped in the opposite lane of traffic (the northbound lane) and an approaching truck, driven by Henderson. Stapleton sent the truck an alert on his CB radio. The alert was too late to help Henderson, who was skidding toward the pickup.
The accident occurred toward the northern curve of the straight highway section. Stapleton's truck carried 9,500 gallons of propane and weighed 78,000 pounds. He estimated his speed at 25 to 30 miles per hour. He did not swerve to the right for fear that his trailer would jackknife on the ice, wipe out the pickup and possibly blow up the propane. As Stapleton pulled even with the pickup, the trailer of Henderson's truck swung around and hit him.
Henderson's truck was travelling north, pulling a flatbed trailer 45 feet long bearing three empty chemical tanks. He had been driving a little over nine hours and planned to stop and sleep in Dubach. Henderson came out of the southern curve in sixth gear, in the high range of his nine gear transmission. When Henderson saw the pickup stopped in his lane of travel, and Stapleton's truck, he started pumping his brakes but *1360 could not stop. From the southern curve to the point of impact, there are approximately 1,100 feet. Henderson testified that he could have stopped three times in the distance available if it had not been for the ice.
Christina Brown was driving a Toyota pickup truck north to Dubach from Ruston. She was averaging 20 to 25 miles per hour. She saw a car in the ditch and a man in the road flagging her down. She did not move off the road for fear of ending up in the ditch but slowed (and probably stopped) for the distressed vehicle. There had been no other traffic that night. Randy Rivet, the man in the road, moved to the shoulder as she slowed and then started running. She saw headlights. A truck crashed to a stop on the shoulder beside her pickup. Brown testified that the accident occurred close to the northern curve toward Dubach. Brown did not see Stapleton's tank truck until after the accident.
Catherine Weimer was a passenger in the pickup. She heard the horn of an eighteen wheeler behind them. As Brown attempted to move the pickup, the engine killed. Weimer also did not see the Stapleton truck until after the accident.
When Rivet started running, Henderson turned right to the shoulder. Stapleton's truck and the pickup were roughly even with each other when Henderson hit the right shoulder. Henderson's cab missed the pickup. Henderson's trailer jackknifed into the left lane and struck Stapleton's cab before arcing around to hit the ditched car.
Dennis Owen, a Dubach city policeman, went to the scene of the accident. There were two to three inches of ice on the road. Like Stapleton, Owen came out of the northern curve from Dubach, the curve closest to the accident. As Owen approached the accident site, he had to keep his car's right side on the shoulder to prevent sliding into the scene. The road slopes toward the opposite ditch, where Henderson's cab came to rest against Rivet's vehicle. The southern curve that Henderson negotiated is known as "trucker's curve". [Tr. 637.] Every three or four months, a truck going north fails to make that curve and ends up in a pond on the right side of the road. Because of concern that the propane would explode, Owen left the scene to assist in evacuating the area.
Ray Herd testified as an expert in the field of accident reconstruction. He placed the site of the accident at approximately 500 feet from the north curve and 1,000 feet from the south curve. In Herd's opinion, Henderson was driving 40 to 50 miles per hour and was still moving around 20 miles per hour at impact. Because of the ice, there were no skid marks on the road. Oil leaking from the broken crankcase of Stapleton's truck left some black marks. Herd identified the point of impact as the center of the southbound lane, near the end of the north curve.
Stephanie Reynolds was in the company of Sheldon Cooper, Randy Rivet and Shannon Durbin that night. Sheldon Cooper was driving Rivet's car, and she was sitting in the passenger seat. The ice was thick, and the car slid off the road into the ditch. She was angry and started walking toward Dubach. Stapleton's large tank truck passed her, and she heard the collision noise.
According to the video deposition testimony of Sheldon Cooper, there was ice on most of Henderson's route from Ruston to Dubach. The southern curve ended in a solid sheet of ice, and Henderson's truck went out of control when it hit the ice. In Cooper's opinion, Henderson's trailer did not hit him because it stopped when it landed on Rivet's car. Like the two women in the pickup, Cooper did not see Stapleton's southbound truck until after the accident.
Randy Rivet also testified in a video deposition. Because of the solid ice on the road, the centerline was invisible. Rivet also did not see Stapleton's truck until after the accident. When Rivet saw Henderson's truck moving toward him, he grabbed Shannon Durbin and they both hit the ditch. The trailer of Henderson's truck landed on top of Rivet's car. [The statement in the court of appeal opinion that the Rivet vehicle was not hit is unsupported by the evidence. Henderson admitted his trailer ended up against the Rivet car. He was "... glad there wasn't anybody in it." (Tr. 573.)]
James A. Tooke testified as an expert surveyor about the survey he conducted of the *1361 accident site. A driver, like Henderson, travelling north, coming around the southern curve, had an unobstructed line of sight measuring approximately 1,600 feet.
The alleged trial error was Henderson's testimony about his two million miles of safe driving and awards from the National Safety Council. The jury was instructed that this could be considered as evidence of habit or routine practice under LSA-C.E. art. 406. The court of appeal correctly concluded that this was character evidence and inadmissible, but found the error harmless. Plaintiff argues that the inadmissible evidence requires de novo review. That is unnecessary because the jury's decision that Henderson was not negligent is clearly wrong.

LAW AND DISCUSSION

Brown
LSA-R.S. 32:141 provides in pertinent part:
§ 141. Stopping, standing or parking outside business or residence districts
A. Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.
* * * * * *
C. The driver of any vehicle left parked, attended or unattended, on any highway, between sunset and sunrise, shall display appropriate signal lights thereon, sufficient to warn approaching traffic of its presence.
It is doubtful that Christina Brown is within the ambit of Section A of the statute. She slowed and intended to stop, but it was not practicable to pull off the highway. A clear view of her vehicle was available and the highway appeared unobstructed. Her attempt to render assistance to the occupants of the ditched car is commendable. The occupants could have had serious injuries. Christina Brown acted in a reasonable manner. Her only driving deficiency, if any, was her failure to activate her hazard lights. LSA-R.S. 32:141(C). Blinking hazard lights might have given Henderson an additional warning and speeded his reaction. However, the jury found Brown free of fault, and there is no clear error.

Henderson
The accident occurred when Henderson's trailer swung into Stapleton's lane of traffic. Henderson was presumptively negligent. Simon v. Ford Motor Company, 282 So.2d 126, 128 (La.1973); Brannon v. Shelter Mut. Ins. Co., 507 So.2d 194, 196 (La.1987); Miller v. Leonard, 588 So.2d 79, 81 (La.1991). As Justice Dennis wrote in King v. Louviere, 543 So.2d 1327, 1331 (La. 1989):
When a driver on his wrong side of the road collides with another car which is in its correct lane of traffic, the driver is required to exculpate himself of any fault, however slight, contributing to the accident.
Henderson, therefore, had the burden of exculpating himself from any fault contributing to the accident.
Henderson took the best option available when he could not stop. He turned to the shoulder and thereby avoided hitting the pickup and injuring or killing its two occupants. The jury apparently sympathized with his predicament and may have considered Henderson exculpated by a sudden emergency. However, the sudden emergency rule only excuses a driver who is proceeding carefully and prudently. Smith v. Marquette Casualty Company, 247 La. 1054, 1065, 176 So.2d 133, 137 (1965). The inescapable fact is that Henderson was travelling at an excessive speed for the prevailing weather conditions. LSA-R.S. 32:64. He and Stapleton saw each other emerging from their respective curves, but Henderson travelled twice as far before they met at the point of *1362 impact. If Henderson had been proceeding more cautiously, he could have stopped and avoided the accident. Eubanks v. Brasseal, 310 So.2d 550, 554 (La.1975). Henderson did not rebut the legal presumption that he was at fault. His trespass into Stapleton's lane of travel caused the accident.

Stapleton
Stapleton assessed the situation as he came out of the northern curve and broadcast a warning. He admitted that the warning was too late to help Henderson. The fact that no one except Henderson saw Stapleton's truck until after the accident suggests that Stapleton's truck was still hidden by the northern curve as the situation developed. Stapleton could have moved to the right and possibly prevented the accident. His reluctance to attempt a sudden maneuver with a loaded propane truck is understandable; he might have jackknifed and caused an explosion. However, some measure of fault must attach to Stapleton.

Percentage of Fault
Examining the parties' respectively fault under the guidelines in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985): both truck drivers were professional operators and therefore in a superior position vis-a-vis Brown. The risk posed when Brown stopped on the icy road was substantial. If she breached her duty to the travelling public, her conduct was influenced by a humanitarian motive. She was not a professional driver. The circumstances extenuated her fault in failing to immediately activate her hazard lights.
Stapleton realized the danger as he came around the northern curve. He might have prevented the accident by moving to the right. However, he remained in a legal lane of travel. The risk presented to Brown and Henderson was great. As it developed, the risk to Stapleton was even greater. He testified that he was afraid to change lanes on the solid ice. In his own self-interest, he would have moved over if he had thought the move was feasible. Stapleton had half the distance to avoid the accident that was available to Henderson and was in an inferior position to prevent the accident.
Henderson knew the road was icy. His excessive speed, as he hurried to finish his driving stint in Dubach, precipitated the accident. Although Henderson did not anticipate a car stopped in his lane of travel, he should have been able to avoid the accident in the available distance. See Mart v. Hill, 505 So.2d 1120, 1124 (La.1987). Like defendant Hill, Henderson was an experienced driver who should have been aware of the danger created by his excessive speed on the icy road. Like Hill, Henderson took the best available alternative in turning to the shoulder and thereby preventing greater injury or death. However, his excessive speed was the primary cause of the accident.

Intervention
LSA-R.S. 23:1101(D) requires a trial judge to try a worker's compensation intervention. The court of appeal correctly decided that Section D must be interpreted with Section B, which mandates an identical percentage recovery for the employer and the employee. The determination of fault must be made by one trier of fact. Only the issues relating to the compensation claim, i.e., the existence of an employment relationship and the course and scope of employment, must be decided by a judge. The court of appeal's analysis of the respective duties of the judge and jury is approved, although in this case the trial judge reached a better result than the jury.

CONCLUSION
The jury's verdict is clearly wrong in finding Henderson free of fault. The testimony about Henderson's safe driving record may have contributed to the erroneous verdict. Stapleton probably prejudiced the jury against himself when his testimony varied from a pretrial statement. The jury was undoubtedly impressed with Henderson's exemplary driving record, Brown's attempt to render assistance and Stapleton's lack of candor. These factors, assisted by the able arguments of defense counsel, led the jury into manifest error.
Christina Brown acted as a good Samaritan in stopping to render assistance. She *1363 should have activated her hazard lights, but the jury was not clearly wrong in absolving her of fault.
Henderson tried to prevent the accident and almost succeeded. He avoided injury to the girls in the pickup truck. However, his trailer trespassed into Stapleton's lane of travel, creating a presumption of fault. He was travelling too fast on the icy road between Ruston and Dubach. The sheet of ice at the accident scene was not the first ice on the road, and he had been warned of ice before he started the trip. His fault is fixed at 75 percent.
Stapleton was driving in a proper lane of travel and was understandably reluctant to change lanes on the icy road. However, Stapleton might have averted the accident if he had moved to the right. He might also have made things worse. His fault is fixed at 25 percent.
For the foregoing reasons, the judgments of the courts below are vacated and set aside, except insofar as Brown was found not at fault. That finding is affirmed. Judgment is rendered assessing Henderson 75 percent at fault and Stapleton 25 percent at fault. Both the main demand and the intervention are remanded to the court of appeal for the calculation and award of damages in accord with the percentages of fault assigned to the two truck drivers. Also, the court of appeal shall render a proper verdict as to the intervention.
VACATED IN PART; AFFIRMED IN PART; REMANDED.
ORTIQUE, J., concurs in part and dissents in part and assigns reasons for the dissent.
ORTIQUE, Justice, dissenting:
I respectfully dissent from that aspect of the majority opinion which relieves the defendant, Christina R. Brown, of any and all liability.
Even a cursory examination of the record regarding the actions of Christina Brown, leads to the inevitable conclusion that Ms. Brown contributed to the accident which led to the injuries suffered by plaintiff, Johnny Stapleton. Counsel for Ms. Brown states at p. 6 of his Brief as follows:
"Undoubtedly, the presence of Ms. Brown's vehicle either stopped or slowed in the Northbound lane, was a cause-in-fact of this accident."[1]
This is an admission that bears heavily on the question of whether "Brown can be found free of fault". Just as the majority finds it appropriate to review, examine and weigh the action of Max Henderson, the record submitted herein cannot be critically examined as to one defendant, and summarily examined as to the other.
Based on the record, Ms. Brown "parked" her vehicle in the northbound roadway, because she was convinced that she could not safely park it on the shoulder of that road. She indicated by her testimony that she rationally and purposefully stopped her vehicle on the roadway. A careful examination of the trial transcript from pp. 772 thru 800 demonstrates clearly that Ms. Brown stopped her vehicle prior to the accident and that she stopped it in the roadway. She explained[2] that she fully intended to stop when she saw someone (Mr. Cooper) flagging her down:
Q. Mrs. Brown, the night of the accident, did you pull off the road?
A. No, I couldn't.
Q. Why not?
A. I was afraid I would end up in the ditch with them.
Q. Okay. You've testified that you did intend to stop there where he was flagging you down.
A. Yes.
Q. Did this seem like a dangerous thing to do to you?
A. Well when I was coming down the hill, there was no traffic around. Before I *1364 started coming down the hill, I looked and there was no traffic anywhere to be seen
Q. Did you look
A. and we had not
Q. before you started to stop?
A. Yes.
Q. Okay. Did it seem like a dangerous thing to do?
A. No. It didn't at the time.
Q. Okay. At the point where you were coming to a stop, how much room was behind you between you and the curve?
A. Oh, a long ways.
Q. A long ways.
A. I don't know distances.
Q. When you saw Mr. Cooper flagging you down, I know you didn't know that's who it was then, but for the sake of simplicity, I'm gonna call him Mr. Cooper. When you saw him flagging you down, what in your mind were your choices?
A. Well IIas I'd said, there was no traffic out that night and I didn't figure anybody would be coming through any time soon so I was gonna stop and offer them help and see if they needed, you know, me to take them into town or to go get some help.
Trial Transcript pp. 793 & 794.
Counsel for Ms. Brown acknowledges that Louisiana "makes specific provisions for stopping a vehicle on the roadway".[3] He attempts to show that she "complied with the statute". However, it is obvious that the statute refers to normal conditions and not a condition which includes a roadway covered by a sheet of ice. A literal compliance with the statute on this night, does not relieve Ms. Brown of her negligence.
I respectfully contend that the evidence does not support a finding that Ms. Brown behaved as a reasonably prudent person should have behaved that night. This does not mean that I do not empathize with her conviction regarding a fellowhuman being in distress. The magnanimity of her action must not be and is not denigrated one iota. Magnanimity, however, is not a criterion of negligence,in our jurisprudence or our positive law. If that was or ever is to be, actions of "well meaning" and "good intention" could enfeeble or subvert our criminal as well as our civil law.[4]
Counsel for Ms. Brown suggests that his client enjoyed the posture of a "rescuer", and thus she is relieved from civil liability for her actions. I have read the authorities cited by counsel and I am convinced that these, (nor any of the other dozen it was appropriate to review), do not exculpate his client from civil legal liability under the circumstances of the case at bar. Early on, our Courts held that "a rescuer is only excused from such oversights as the situation requiring rescue might reasonably have caused". Thus Judge *1365 Blanche, of the First Circuit noted in Stevenson v. Delahaye, 310 So.2d 651, 653-654 (La. App. 1st Cir.1975), that to enjoy the status of a rescuer, there must be an "obvious peril" coupled with an "element of immediate danger or emergency.... a danger akin to an urgent rescue". Our factual situation does not meet that criteria. The only "elements of immediate danger or emergency" were those actions of Ms. Brown. None of which is contemplated by our "rescuer jurisprudence".
I would hasten to add that it is too late to urge some special doctrine of law at this level. See Dodge v. Pierre, 348 So.2d 167 (La.App. 3rd Cir.1977), in which then Judge Watson cites the Blanche opinion with approbatory language: "...... a scholarly review of cases....." Nor does the statute codifying the so called "Good Samaritan immunity" countenance the actions of Ms. Brown. (See: La.R.S. 9:2793) nor grant to her, relief!
Even viewed in the light most favorable to her, Ms. Brown's admissions of concern for her own safety under such hazardous conditions evoke the conclusion that she acted negligently.
While she may have looked around and observed that the highway was clear "for 1000 to 1600 feet" to her rear. This was not definitive of a "reasonable activity" for a driver on a well travelled highway, under normal circumstances. At twenty five miles an hour, (the speed that she found to be reasonable, due to the sheet of ice on the road), that distance would be covered in less than 30 seconds. That distance would be travelled in less than 20 seconds, if the opinion of the expert, Ray Herd, is to be believed, (i.e. that Henderson was travelling at 50 to 60 MPH).
Let us assume for the moment that the Brown vehicle was coasting to a stop at the time the Henderson vehicle came around the curve, and she was in fact travelling, (Brown's pick-up), at 5 to 10 MPH. Would Henderson have contemplated that such a slow moving vehicle should be on the highway in front of him? Should he have concluded that he could safely travel 50 to 60 miles per hour because the highway would not be heavily travelled at that hour? Under those icy conditions the Trial Court and the Court of Appeal concluded that the actions of Henderson were unreasonablebut using similar but a grotesque analysis those Courts ordained that Ms. Brown's actions were reasonable..... I disagree.
As pointed out by Counsel for Ms. Brown, the statute governing her actions is quite specific. It says "Thou shall not stop on the travelled lanes of a highway, unless you take certain very specific action". Her Counsel urges that because her stop lights or tail lights were on, (there is nothing in the record to support him on this point), she fully complied with the statute. However, a careful reading of R.S. 32:141, (the law at the time), reveals in pertinent part: "....... shall display appropriate signal lights thereon, sufficient to warn approaching traffic of its presence".
In the instant case, Ms. Brown was driving a 1981 Toyota pick-up truck. At no time, did she state that she had turned on her "hazard lights". Blinking lights/hazard lights fit more closely the directive of the statute "shall display appropriate signal lights thereon, sufficient to warn, etc." (emphasis ours).
Search as I might, I found no reported case of a person stopping on the roadway to assist someone who appeared to be in trouble. There was a case in the Second Circuit, where a truck driver who stopped his truck on a paved portion of highway for purposes of picking up a friend, who had hailed him for a ride, was found to be "negligent". Marler v. Carlino, 50 So.2d 112 (La.App. 2d Cir. 1951). Admittedly, this case is not on "all fours" with our case at bar, but the legal principles as it affects the action of the driver of the stopped vehicle, are cogent.
Of greater significance, in our view, is the failure of the lower court to find negligence per se, in this case, on the part of Ms. Brown. Even if one considers the rationale posed by her Counsel, he does not take into account the hazardous condition of the road, which every user of the highway owes a duty to every other user thereof, to consider.[5] *1366 We would hasten to add that even where a motorist stops on a travelled portion of the highway and may have been in technical compliance with this section of the statute (R.S. 32:241).... Courts are not precluded from finding that the motorist's action constituted negligence. Miller v. Carter, 346 So.2d 748 (La.App. 1st Cir.), writ den., 349 So.2d 1272 (La.1977).
This Court decided earlier this year, in an Opinion written by Justice C. Kimball, covering several fundamental principles of tort liability, that: "In determining tort liability, duty-risk analysis is employed, involving finding of causation-in-fact and determining whether this law imposes a duty under the circumstances, and if so, whether particular risk which occurred is within scope of protection extended by imposition of the duty." Younger v. Marshall Industries, Inc., 618 So.2d 866, 872 (La.1993). Applying these principles to Ms. Brown's actions lead me to the conclusion that she was negligent and her negligence is actionable under our "duty-risk" analysis.
One of the most succinct analysis of the duty/risk principle applicable to this case is found in the opinion of retired Justice Mack Barham, on Rehearing, in Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970). See also: Dixie Drive It Yourself System v. Amer. Bev. Co., 242 La. 471, 137 So.2d 298 (1962).
Where causation in fact is a breach of a duty imposed to protect from the particular risk involved and this breach is an act negligent per se, the mere fact that there is a later and intervening negligent actor who helped to create the particular risk involved will not absolve the first negligent actor from responsibility.
* * * * * *
This does not mean that every consequence of a negligent act of man requires him to respond in damages.................. Our holding....... in this case does not afford a basis for belief that this will result. The keys for the solution of the issue of responsibility when there is more than one cause-in-fact of damages are (1) a determination of the exact risk or risks anticipated by imposition of the legal duty which has been breached and (2) the legal or policy considerations which grant excuses from certain consequences which follow an act of negligence. This requires, under the facts and the law of each case and the attendant exigencies, a jurisprudential determination which will implement and make effective our broad codal provisions concerning those who should respond in damages for their faults.
The only thing that Ms. Brown has going for her is her "good intentions". But that does not relieve her of her duty to other users of the highway.
I would find on the basis of this record that the Lower Courts were manifestly erroneous when they absolved Ms. Brown of any actionable negligence.
I would further find:
1MRS. CHRISTINA R. BROWN = 20% negligent
2JOHNNY STAPLETON = 30% negligent
3MAX HENDERSON = 50% negligent
I would adopt the rationale of the majority in determining that both Henderson and Stapleton were negligentHenderson much more than anyone, but I would apportion fault, as indicated hereinabove, for the reasons assigned.
NOTES
[1] Pursuant to Rule IV, Part 2, § 3, Kimball, J. was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] See: ORIGINAL BRIEF ON THE MERITS ON BEHALF OF CHRISTIAN RENAE BROWN AND LA. INDEMNITY CO., Defendant-Respondents, @ p. 6.
[2] Trial Transcript, p. 794, 2 thru 13.
[3] LSA-R.S. 32:141. Stopping standing or parking outside business or residence districts

A. Upon any highway outside of a business or residence district, no persons shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main travelled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.
* * * * * *
C. The driver of any vehicle left parked, attended or unattended, on any highway, between sunset and sunrise, shall display appropriate signal lights thereon, sufficient to warn approaching traffic of its presence.
[4] Numerous instances of "good deeds" come to mind, where one must be held accountable despite noble intentions:

aRobin Hood was nonetheless a robber and a thief under English law, even if he gave it all to the poor and disadvantaged;
bThe neighbor who peers from his second story window and sees a toddler playing near a swimming pool, absent an adult or older person, and decides to drive thru his adjacent neighbor's yard, destroying the fence and emasculating his neighbor's hot house, is civilly liable for the damages he does, even if he is exonerated for criminal trespass.
cVeteran defenders (lawyers) in the old Civil Rights years solemnly advised the demonstrators that they must be prepared to pay the price (even jail) for their actions, no matter how just their cause.
[5] No authority required.