862 So.2d 248 (2003)
Malcolm COOLEY and Ruth D. Cooley, Plaintiffs-Appellants
v.
TRINITY UNIVERSAL INSURANCE COMPANY, Defendant-Appellee.
No. 37,701-CA.
Court of Appeal of Louisiana, Second Circuit.
November 26, 2003.
*249 Robert G. Foley, Monroe, Richard L. Fewell, Jr., West Monroe, Counsel for Appellants.
Richard D. Chappuis, Jr., Lafayette, Cyd Sheree Page, Monroe, Kristen Broussard Menard, Lafayette, Counsel for Appellee.
Before BROWN, WILLIAMS and DREW, JJ.
*250 DREW, J.
Plaintiffs, Malcolm Cooley and his wife, Ruth Cooley, appeal the judgment denying recovery against their own uninsured/under insured motorist carrier, Trinity Universal Insurance Company. The Cooleys' damages arose out of a two-car collision on Highway 80 in Ouachita Parish. Mrs. Cooley was turning left onto the highway from a parking lot north of the road so she could proceed east into West Monroe. Ann A. Halley, who was driving her Suburban west towards Calhoun, struck Mrs. Cooley's Ford Taurus as it was crossing the westbound lane. Plaintiffs contend that the collision resulted from Halley's negligence. Following a trial limited to the liability issue, the jury found in favor of defendant, Trinity, after which the trial court denied plaintiffs' subsequent Motions for Judgment Notwithstanding the Verdict and in the alternative, for New Trial.
On appeal, the plaintiffs assert that the jury erred in finding Halley free from fault because she had crossed the double yellow center line into the eastbound lane. Plaintiffs further assert that the jury erred in deciding that Halley had rebutted the presumption of her fault in causing the crash. For the following reasons, the judgment is affirmed.

FACTS AND TESTIMONY
Plaintiffs own and operate Cooley Printing, which sells printing, office supplies, and furniture. Mrs. Cooley calls upon customers, including Dixie Hydro-Vac, which is located on the north side of Highway 80 west of West Monroe. After concluding her business at Dixie Hydro-Vac, Cooley intended to return to West Monroe. Exiting the parking lot, Cooley had to traverse the westbound lane in order to make the left turn into the eastbound lane of Highway 80. Cooley testified:
 She looked in both directions and then pulled into the eastbound lane.
 She straightened her vehicle completely into the eastbound lane when she observed Halley's vehicle, a 1996 GMC Suburban, cross the center line.
 Halley's vehicle struck Cooley's vehicle head-on, entirely in the eastbound lane of travel.
A registered nurse who resides in Union Parish, Halley had taken her three-year-old grandson shopping. Returning the child to his home near Calhoun, Halley drove west on Highway 80. Although she was not sure of her exact speed, she testified she was not in a hurry because the child had fallen asleep in his car seat and she wanted him to sleep. Halley believed that she was driving at or below the speed limit. As she approached the Dixie Hydro-Vac parking lot, Halley observed the white Taurus pulling onto the roadway and into the westbound lane from the west side of the Dixie Hydro-Vac parking lot. Halley thought Cooley looked at her and believed that Cooley saw her and would stop. Halley veered slightly left into the eastbound lane in the hope that she could negotiate around the Cooley vehicle and avoid the collision. Halley's thought process was that if she swerved to the right toward the Dixie Hydro-Vac parking lot, her vehicle would impact the Cooley auto broadside at the driver's door.

TESTIMONY OF WITNESSES
Ouachita Sheriff's Deputy Darryl Frost testified via video tape, that:
 He was the officer who responded and investigated the accident on September 30, 1997.
 The damage to the white Taurus was located at the right front side while the damage to the Suburban was at the front end.
*251  The vehicles were locked together at the scenethe front fender above the tire of the Taurus was attached to the front end of the Suburbanand had to be separated by the wrecker drivers.
 He was unable to speak with Halley, who, along with her grandson, had been transported by ambulance to the emergency room.
 When he spoke with Cooley, however, inside the Dixie Hydro-Vac building, she indicated to him that she did not see the Halley vehicle before she entered the eastbound lane.
 At the hospital, Halley told him that she had been westbound on U.S. 80 when Cooley pulled out into her pathway, and she veered into the eastbound lane to avoid the accident.
 He made no notation in his report with regard to the existence or location of debris from the accident. He believed, based upon the location of and damage to the vehicles, that the Cooley vehicle was headed more in a southerly direction, as if coming out of the parking lot.
The two wrecker drivers pulled the interlocked vehicles apart using the wreckers. Both of them estimated the field of debris to be 50 to 60 feet from the point of impact. They further testified that the resting place of the vehicles was farther on the shoulder of the highway than other witnesses remembered it to be. The accident occurred in September of 1997, while the trial was not held until June 2002.
Several employees of Dixie Hydro-Vac testified on behalf of the defendant. Although none saw the accident, they described the events which occurred shortly thereafter. Gay Viereck, Jo Ann Bass, and Carolyn McHenry heard the crash and went outside. All three observed that the Cooley vehicle had been impacted over the right front wheel. All three testified that they believed the automobiles were positioned in the middle of the highway, farther to the center than described by the wrecker drivers. Jo Ann Bass stated that she helped Cooley out of the passenger side of the vehicle. Carolyn McHenry confirmed that testimony, stating that she was right behind Bass and that she also assisted in extricating Cooley, although Cooley did not recall being assisted from the car. The employees stated that they mistook the air bag smoke for actual smoke and were afraid of an explosion. They further stated that they feared for their own safety because of the position of the vehicles in the middle of the highway.

EXPERT TESTIMONY
Plaintiffs' accident reconstruction expert, Andrew J. McPhate, reviewed the accident report, photographs, witness deposition testimony, and depositions of Ray Herd and Jere Johnston, defendant's experts. McPhate also viewed the accident scene, took appropriate measurements, observed traffic at the site, and listened to the testimony at trial.
 There was left-side-to-left-side contact between the vehicles. The Suburban had to be going in at a slight angle in order to get the bumper essentially behind the wheel.
 The Cooley vehicle was not "T-boned" by the Halley vehicle; i.e., the impact did not occur at a perfect 90 degree angle.
 The deployment of the driver-side air bag indicated a more frontal impact with enough rear acceleration to trigger the air bag.
 Cooley was traveling about 12 miles an hour at the time of the impact.
 Prior to the application of brakes, Halley's speed was 71 miles per hour at *252 the highest and 62 miles per hour at the lowest.[1]
 Halley had an opportunity to maneuver onto the right shoulder of the road.
On cross-examination, McPhate acknowledged that he had arrived at Halley' speed by relying on Scott Kirkland's (one of the wrecker drivers) deposition testimony that the debris field was 50 to 60 feet.[2] If the debris field was 30 feet, however, he estimated Halley's pre-braking speed at 54.5 miles per hour. A 40-feet field of debris meant Halley's pre-braking speed would have been about 55.5 miles per hour. McPhate further acknowledged that the deposition of Ray Herd,[3] which he reviewed in preparation for the trial, estimated Halley's speed to be 55 miles per hour. He further admitted that Cooley's version of the accident was unlikely given the physical evidence.
The defense accident reconstruction expert, Jere Johnston, testified based upon his review of the police report, depositions, photographs, and the accident scene that:
 The Suburban came in at about a 40-degree angle to the front of the Taurus as opposed to the 35-degree angle estimated by plaintiffs' expert.
 Estimates of Halley's pre-braking speed ranged from 56.7 to 51.9 miles per hour, depending on the factors used.
 The left front wheel of the Taurus was in a turn position.
 The vehicles were joined together at the final resting place, approximately 30 feet from the point of impact.
 If Halley had not steered left, she would have impacted anyway, most likely directly at the driver's position.

DISCUSSION
In order to resolve the issue on appeal, we must determine whether or not the jury's factual findings were manifestly erroneous or clearly wrong. In Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882-883 (La.1993), the Louisiana Supreme Court set forth a two-part test for the reversal of a fact finder's determinations:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the *253 trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
Stobart, supra, at pp. 882-883. (Citations omitted.)
Plaintiffs rely heavily upon the presumption that when a collision occurs between two vehicles, one of which is in the wrong lane of travel, there is a presumption that the driver in the wrong lane was negligent and that the burden of proof is on the driver to show that the collision was not caused by his own negligence. Simon v. Ford Motor Co., 282 So.2d 126 (La. 1973). Defendant, on the other hand, points out that this presumption of negligence attaches to Halley only if Cooley was in her proper lane of travel. Carter v. The Travelers Ins. Co., 535 So.2d 1001 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1202 (La.1989). In Carter, the trial court found that the Carter vehicle was at least partially in the wrong lane of travel; therefore, the burden of proof did not shift to the defendant to whom the presumption did not apply. Likewise, in this dispute, the great weight of the evidence is that the Cooley vehicle was at least partially in Halley's westbound lane that Cooley was attempting to cross in order to turn east onto Highway 80.
Under the Sudden Emergency Doctrine, one who finds herself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or the best means to avoid an impending danger, is not guilty of negligence if she fails to adopt what subsequently and upon reflection appears to be the better method, unless the emergency is brought about by her own negligence. Jackson v. Town of Grambling, 29,198 (La. App.2d Cir.2/26/97), 690 So.2d 942. The rationale is that in a sudden emergency, a person who does not have sufficient time to weigh and consider the best means to avoid an impending danger, should not be held to the same standard of control, care, and caution as someone who has ample time to fully exercise judgment and reason. Whiddon v. Hutchinson, 94-2000 (La.App. 1st Cir.2/23/96), 668 So.2d 1368, writs denied, 96-0731, 96-0775 (La.5/10/96), 672 So.2d 923.
*254 Citing Stapleton v. Great Lakes Chemical, 627 So.2d 1358 (La.1993), plaintiffs argue that the Sudden Emergency Doctrine is not applicable. However, the Cooleys' reliance upon Stapleton is misplaced. In Stapleton, supra, an accident occurred when a driver's trailer jack-knifed into the path of the plaintiff's lane of travel. The Sudden Emergency Doctrine did not apply in Stapleton to exonerate the driver of the jack-knifed truck, which was traveling at an excessive rate of speed for the icy conditions and could have possibly avoided the accident had he been proceeding more cautiously. The Cooleys contend that Halley was speeding and negligent in this collision. Based upon the evidence set out above, the jury was not unreasonable in finding that Halley was neither speeding nor at fault.
Additionally, plaintiffs assert that Halley was negligent in her failure to steer the vehicle to the right shoulder in order to avoid the collision, pointing out that the Stapleton driver was found to be negligent even though he tried to use the shoulder of the road to avert the impending collision. In contrast, defendant argues that Halley was faced with a sudden emergency created by Cooley so that Halley was under no duty to take the best possible course of action. The jury's conclusion that Halley was not negligent in swerving to the left rather than veering toward the right-hand shoulder was reasonable and supported by the evidence. Halley testified that she believed, in that instant, that Cooley had seen her and was going to stop, which would have allowed Halley to drive around the Cooley car on the left in the eastbound lane at least in part. Halley further stated that she feared that a swerve to the right toward the parking lot from which Cooley drove could possibly have resulted in a direct impact and serious injury to the other driver.
A driver entering a highway has a high duty to avoid a collision; this duty becomes more onerous as the hazards increase and requires a motorist to use every reasonable means available to ascertain that the driver's entry onto the highway may be made in safety; this driver is required to keep a lookout for vehicles on the highway and refrain from entering until it is safe. Daniels v. Burridge, XXXX-XXXX (La.App. 4th Cir.3/21/01), 785 So.2d 906, writ denied, XXXX-XXXX (La.6/1/01), 793 So.2d 201. A left turn is a dangerous maneuver and the driver has a duty not to attempt the turn until he ascertains it can be completed safely. Hawkins v. Gilfoil, 483 So.2d 1082 (La.App. 2d Cir.1986).
Cooley, as the left-turning motorist from the parking lot onto the roadway, clearly had the obligation to observe both lanes of travel prior to entering the roadway. Notwithstanding her trial testimony that she saw Halley and had time to complete her turn, Cooley's statement to the investigating officer at the time of the accident was that she did not see Halley at all. Cooley's trial testimony was the only evidence which supported plaintiffs' contention that Cooley was entirely straight in her own eastbound lane of travel and that the collision was head-on. Given the overwhelming evidence to the contrary, the jury reasonably discounted Cooley's version of the collision.
The bottom line is that Cooley pulled onto the highway in front of the Halley Suburban, which was proceeding in a reasonable manner. Despite Halley's best efforts when faced with the sudden emergency, she was unable to avoid striking the Cooley vehicle. Under the circumstances of this case, we find no clear error in the jury's conclusion that Halley's actions were reasonable. We affirm.

*255 DECREE
For the reasons set forth, the judgment is affirmed. All costs are assessed to plaintiffs.
AFFIRMED.
NOTES
[1] The evidence was that the actual posted speed limit was 55 miles per hour although Deputy Frost's report had stated the limit to be 45 miles per hour.
[2] Kirkland's testimony at trial was that his estimate of the length of the debris field was a "guesstimate," and it could have been a little more than 30 up to 60 feet.
[3] Ray Herd, plaintiffs' initial expert, died before the trial.