It HARRISON, J. (Pro Tempore).
In this automobile accident case, defendants in reconvention, Helen Noble and Safeway Insurance Company of Louisiana, appeal a judgment in favor of plaintiff in reconvention, Aaron Rideau. The court *231 found no comparative fault on the part of Mr. Rideau whose vehicle was struck by-Ms. Noble’s vehicle when Rideau had nearly completed a left turn from the roadway into a parking lot. Appellants assert that the trial court failed to properly apply the law regarding a left-turning motorist, and that the trial court clearly erred in concluding that the collision may have . occurred on the shoulder of the road. For the reasons set forth below, we affirm.
FACTS
On September 6, 2001, Mr. Rideau was driving a 1975 Ford-pickup on North Market Street in Shreveport, Louisiana. Ri-deau was headed in a northerly direction, and just before the accident he pulled into the left-turn lane at the intersection of North Market Street and Martin' Luther King Drive. In addition to the turn lane, there are two northbound lanes and two southbound lanes of North Market at the intersection. Rideau intended to turn left into the parking lot of a pawn shop located on the southwest corner of the intersection. In order to do so, he had to cross the double yellow line that separated the northbound and southbound lanes of North Market Street, cross the two southbound lanes, and enter the parking lot.
At the same time, Ms. Noble was driving her 1997 Chevrolet Lumina west on Martin Luther King Drive to where it intersected North Market Street. Martin Luther King Drive has a turn lane for eastbound motorists who wish to turn right onto North Market Street. The turn lane veers off at an angle from |2Martin Luther King Drive onto the outside southbound lane of North Market Street;, the turn lane has a yield sign for those motorists who are about to merge into the southbound lane.
In the moments before the accident, Mr. Rideau was stopped in the turn lane with approximately three vehicles ahead of him. His destination, the driveway of the pawn shop, was approximately 40 to 50 feet from the intersection. When the left-turn arrow of the traffic signal turned green, Rideau made his left turn toward the pawn shop driveway. At the same time, Ms. Noble was merging onto North Market Street from Martin Luther King Drive. Noble’s vehicle collided with the passenger side of the Rideau vehicle; the impact to the Ri-deau vehicle occurred just behind the passenger-side door between the door and the rear wheel well. After the impact, Ri-deau’s vehicle rolled into the pawn shop parking lot, while Noble’s vehicle came to a stop near the point of collision.
On November 26, 2001, Noble filed a petition for damages against Rideau and his insurer, Horace Mann Insurance Company. The defendants filed a general denial answer, pleading comparative fault in the alternative. Subsequently, the defendants filed a reconventional demand against Noble and her insurer, ■ Safeway Insurance Company of Lpuisiana. Noble and Safeway filed an answer denying the allegations of, the reconventional demand, and also pleading comparative negligence in the alternative.
In October 2003, pursuant to a joint motion to dismiss, all of Noble’s claims were dismissed with prejudice after Horace Mann paid her its policy ^limits on Rideau’s policy. The joint motion to dismiss reserved to Rideau all of his claims against Noble and Safeway.
When Rideau’s claims came on for trial, five witnesses testified. In addition to Mr. Rideau and Ms. Noble, there was testimony from Officer James Green of the Shreveport Police Department who investigated the accident, from Ms. Rosario Ay-roso (Mr. Rideau’s wife who was seated in the front passenger of his vehicle at the time of the accident), and from Mr. Shawn *232 Dudley (a driver who witnessed the aftermath of the accident.) As the following synopsis of the witnesses’ testimony shows, the facts of the accident were very much in dispute.
Officer Green testified that he investigated the accident immediately after its occurrence. However, at trial he could remember very little about the investigation and needed his official report to refresh his memory. Officer Green stated that Rideau told him Noble came around the curve and ran into Rideau as he was making a left turn, while Noble told the officer that Rideau pulled in front of her and she could not avoid hitting him. Noble’s vehicle was damaged across the front, while Rideau’s was damaged behind the passenger-side door. Although the accident report indicated that point of impact was in the outside southbound lane of North Market, Officer Green was unsure at trial how he made that determination. He could not recall seeing any debris in the roadway, and he did not recall if he asked either of the parties where the accident occurred. However, Officer Green did respond affirmatively when asked if Mr. Rideau had already crossed one southbound lane of North Market Land if the front of Rideau’s truck would have had to have already crossed the outside southbound lane as well.
Mr. Rideau testified next. He indicated that when the light turned green, he began to make his left turn to the pawn shop. He indicated that as he was going into the drive of the pawn shop, his wife yelled for him to “look out,” and he then saw Noble just before her vehicle hit his. According to Rideau, his truck “went up on the wheels on the driver’s side” upon impact, and as a result the driver’s side tires were “busted.” His vehicle then rolled down to the pawn shop. Rideau indicated that the impact occurred on the shoulder of the road, and that Noble’s vehicle stopped at that point because it really couldn’t go anywhere. According to Rideau, Noble came around the corner at a high rate of speed, hugging the shoulder, and would not have hit Rideau if she had stayed on the road. Rideau later testified that the reason he believed Noble was traveling at a high rate of speed was because the impact was hard enough to lift his truck off the ground.
The next witness to testify was Ms. Ay-roao, Mr. Rideau’s wife. Her testimony essentially corroborated that of her husband. She indicated that they were in the left-turn lane and noticed they had the arrow to turn onto Martin Luther King; when it was clear enough to turn, they went into the pawn shop driveway and were already into the driveway when they were struck. Although she did not know the direction in which the traffic was moving, she gave the following account of what happened from the point they started to make their turn:
Okay as we were turning uh we notice it was clear but me and my little brother were pay well myself I was paying attention to the Lears coming off of Martin Luther King on this uh they could make a right turn onto Martin Luther onto North Market it’s a there is a yield sign so you have to yield onto oncoming traffic and T notice that a car was coming and I you know I was lot of traffic comes through there and some people don’t slow down. Some people don’t stop. They don’t even yield. They just keep coming through and as we were turning into I felt we were safe enough you know but here comes this car. She just comes around. She’s she looks like she’s in the lane where you should be turning onto North Market but she was on the picture she was on the shoulder. *233 And she hit us. I mean even my little brother said she was coming pretty fast.
Ayroso stated that Noble did not look like she was slowing down and that she never made a complete stop at the yield sign. Instead, Ayroso indicated that Noble was trying to see if there were cars coming from the opposite direction and had her head turned the whole time. Like her husband, Ayroso indicated that Noble’s car was on the shoulder and, thus, it did not have to be moved after the accident.
Shawn Dudley testified next. At the time of the accident, he was southbound on North Market, stopped at the light behind two other vehicles. He gave this description of the events:
While I was sitting there waiting for a light to change. I saw this car I saw this car coming from the yield sign off of Martin Luther King. I saw the car turn around. Saw the person in the car I saw them look back look back toward the traffic and I saw the emerging traffic. I saw the truck I saw the truck come by and I saw the tail end of what looked like an accident.
According to Dudley, Noble’s vehicle stopped at the yield sign for two or three seconds, and he also saw Rideau’s truck making a left turn. However, Dudley testified that it “looked like” the truck hit the car, so Dudley pulled over, got out of his vehicle, and checked to see how Ms. Noble was doing. He also called 911 and then remained “to see what was going on.” Dudley stated | fihe could not be completely sure where the vehicles were at the time of the collision, but could “only assume that the car was in the right lane going [south].” Dudley could not see the actual impact. He also believed that the car moved when it was hit and “kind of slid over to the side of the curb.”
Ms. Noble was the last witness to testify. She stated that she always slowed down at the yield sign, and then stated that she came to a complete stop. She testified that when she came out onto North Market Rideau’s truck came over “the two double yellow lines” and pu|led out in front of her. She testified she could not then avoid the accident. According to Noble, she was not on the shoulder of the road, but in the lane. She stated that the whole front part of her car collided with the side paneling on the passenger side of Rideau’s truck, and that the collision occurred in the right-hand southbound lane of North Market. After the collision, she could not move her vehicle, so she left it there and went to the hospital in an ambulance. On cross-examination, she was asked whether she was looking to see if anyone was coming as' she merged onto North Market, and whether she physically turned her head to look back as she was merging. She responded in the negative, indicating that she had already looked. However, she did indicate that she checked her mirrors to see if any more traffic was coming as she was turning.
In a written opinion issued on September 24, 2003, the trial judge gave the basic facts leading to the accident and stated that Ms. Noble’s vehicle struck Mr. Ri-deau’s, vehicle on the passenger side behind the truck cab as he was entering the parking lot. The court then stated:
It is clear [Ms. Noble] was not maintaining a proper lookout as [she] merged, and from the testimony and photos (P-5) she may 17have been on the shoulder of the road when she struck [Rideau’s] vehicle. The Court finds [Ms. Noble] 10Q% liable.
The Court does not find Mr. Rideau comparatively negligent. He proceeded with his turn when no vehicles were present; he had nearly completed his turn and entered the parking when [Ms. *234 Noble] came off the Southbound merge lane from Martin Luther King Drive; the accident occurred during daylight. His vehicle was plainly visible.
DISCUSSION
In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error — ■ clearly wrong standard which precludes the setting aside of a trial court’s finding of fact unless that finding is clearly wrong in light of the record viewed in its entirety; thus, a reviewing court may not merely decide if it would have found the facts of the case differently, but should affirm the trial court where the trial court judgment is not clearly wrong or manifestly erroneous. Cheairs v. State ex rel DOTD, 2003-0680 (La.12/3/03), 861 So.2d 536. When testimony on an issue conflicts, reasonable evaluations of credibility and inferences of fact should not be disturbed on review. Rosell v. ESCO, 549 So.2d 840 (La.1989); Hope v. City of Shreveport, 37,759 (La. App.2d Cir.12/17/03), 862 So.2d 1139.
As previously noted, Noble asserts on appeal that the trial court erred in failing to properly apply the law regarding a left-turning motorist, and that the trial court was clearly wrong in concluding that the impact “may” have occurred on the shoulder. However, applying the proper standard of review, we must reject Noble’s arguments. Noble correctly argues that a motorist attempting to make a left turn is under a duty to exercise a high degree of care. A left turn is a dangerous maneuver and a driver has a duty not to attempt the turn until he ascertains it can be completed safely. Cooley v. Trinity Universal Ins. Co., 37,701 (La.App.2d Cir.11/26/03), 862 So.2d 248, torit denied, 2003-3532 (La.3/12/04), 869 So.2d 825. However, the court concluded that Mr. Rideau proceeded with his turn when no vehicles were present and had nearly completed his turn when he was struck by Noble. Although Noble’s testimony conflicts with the trial court’s factual findings, the court’s findings are supported by the testimony of both Mr. Rideau and his wife. Furthermore, neither of the other two witnesses, Officer Green and Mr. Dudley, actually witnessed the collision. As for the trial court’s finding about the possible point of impact, both Rideau and his wife testified the impact occurred on the shoulder, while Noble testified it occurred on the road. Again, Dudley did not see the collision and incorrectly assumed that Rideau’s truck had struck Noble’s car, while Officer Green, who also did not witness the accident, admitted that he could not remember why his report indicated that the collision occurred on the roadway.
Given the conflicting testimony, and giving proper deference to the trial court’s factual findings, we find no manifest error in the trial court’s decision to accord no percentage of fault to Mr. Rideau.
CONCLUSION
For the reasons set forth above, the judgment of the trial court is affirmed at appellant’s costs.
AFFIRMED.